

# Exhibit 'A'

February 19, 2026


Shubhra R. Mashelkar, Attorney at Law
Weinberg, Wheeler, Hudgins, Gunn & Dial, LLC
3344 Peachtree Road NE, Suite 2400
Atlanta, GA 30326

> Re:   *RR v. ESA P Portfolio L.L.C.*

Dear Ms. Mashelkar:

Please find attached my report in the above referenced matter.  This report may be supplemented as additional discovery is made available and other case activity is completed.

In arriving at my opinions in this case, I adhered to the consensus-based, published, and peer-reviewed *Forensic Methodology* (Appendix B) promulgated by the International Association of Professional Security Consultants.


Respectfully submitted,

Karim H. Vellani, CPP, CSC

## Table of Contents

QUALIFICATIONS ................................................................................................. 3

MATERIALS RECEIVED ....................................................................................... 5

DEFINITIONS ....................................................................................................... 7

SEX TRAFFICKING VICTIM IDENTIFICATION ................................................. 12

SUBJECT PLACE CHARACTERIZATION .......................................................... 23

SUBJECT INCIDENT BACKGROUND ............................................................... 24

CRIME RISK ....................................................................................................... 25
  Methodology ..................................................................................................... 25
  Prevalence of Sex Trafficking .......................................................................... 25
  Recency and Proximity ..................................................................................... 27
  Similarity and Frequency .................................................................................. 32
  Calls for Service vs. Crimes ............................................................................. 36
  Analysis of Crime at ESA Site 1510 and Site 9638 ......................................... 37
  Inherent Threats ............................................................................................... 37
  Awareness ........................................................................................................ 40

CRIME PREVENTION ........................................................................................ 41
  Human Trafficking Initiatives ............................................................................ 44
  Security Policies ............................................................................................... 48
  Physical Security .............................................................................................. 49
  Security Personnel ........................................................................................... 49

OPINIONS ........................................................................................................... 50

PUBLICATIONS .................................................................................................. 52

TESTIMONIAL HISTORY ................................................................................... 60

COMPENSATION ............................................................................................... 69

APPENDIX A:  Curriculum Vitae of Karim Vellani ......................................... 70

APPENDIX B:  Forensic Methodology ............................................................ 85



**QUALIFICATIONS**

**Trial Testimony in Civil Sex Trafficking Cases**

- Civil Action File No. 1:20-cv-05233-SEG; J.G., Plaintiff vs. Northbrook Industries, Inc., d/b/a United Inn and Suites, Defendant; In the United States District Court for the Northern District of Georgia, Atlanta Division (Trial Testimony July 9-10, 2025)

- Case No. 3:23-cv-00388-IM; A.B., an individual, Plaintiff, v. Interstate Management Company, LLC, doing business as Residence Inn Portland Airport, Defendant; In the United States District Court for the District of Oregon, Portland Division (Trial Testimony December 4, 2025)

Karim Vellani is President of Threat Analysis Group, LLC, an independent security consulting firm. Board Certified in Security Management (CPP) and as a Security Consultant (CSC), he has over 30 years of experience in security management. He holds a bachelor's degree in Criminal Justice and a master's degree in Criminal Justice Management. He is the author of Applied Crime Analysis, Strategic Security Management, and Unraveled: An Evidence-Based Approach to Understanding and Preventing Crime, and has contributed to many other security publications and journals. Karim collaborates on research initiatives focused on preventing violent crime, workplace violence, and sex trafficking. As an Adjunct Professor at the University of Houston–Downtown, he taught graduate-level courses in Security Management and Risk Analysis. He has trained police and security officers in firearms use and the application of force and frequently serves as an instructor for professional security organizations.

**Karim's practical experience in combating sex trafficking in lodging environments began in 2009 when he was engaged by the City of Houston. As part of that initiative, he supported Mayor Bill White's Office by reviewing existing literature on sex trafficking, assessing threats and vulnerabilities at specific hotels, and creating strategies to reduce the risk of sex trafficking and vice-related crimes. Since that time, Karim has conducted research, published on sex trafficking mitigation, and developed victim identification and response programs across multiple settings, including healthcare. In 2023, he was commissioned by the Council on Guidelines for the International Association of Healthcare Security and Safety (IAHSS) to lead the development of a [Human Trafficking Victim Identification and Response guideline](#), which was published in August, 2025.**

As an independent security consultant, Karim has advised Fortune 500 companies and government agencies on security risk management and force protection. He regularly consults for government, commercial, and residential sites across the country, with a portfolio including data centers, healthcare facilities, houses of worship, manufacturing plants, financial institutions, retail stores, shopping centers and malls, hotels and motels,



office buildings, and residential housing. For 11 years, Karim was responsible for managing the quality control/assurance function for the U.S. Department of Homeland Security's protection force at federal buildings in 23 states.

Karim specializes in crime analysis and security risk assessment. He developed a crime analysis methodology and software application based on the FBI's Uniform Crime Reporting system, enabling users to identify threats, select effective countermeasures, and mitigate risks. First introduced in Applied Crime Analysis and expanded in Unraveled, this methodology has been applied in threat assessments for thousands of facilities. He also created the Security Risk Assessment Methodology for Healthcare Facilities, published by the International Association for Healthcare Security & Safety (IAHSS) in 2009. In 2023, Karim authored the IAHSS Human Trafficking Victim Identification and Response guideline and served on the ASIS International Technical Committee for the Risk Assessment Standard.

Karim is an active member of several professional organizations, including the International Association of Professional Security Consultants (IAPSC), ASIS International, the American Society of Criminology (ASC), the American Society of Evidence-Based Policing (ASEBP), the International Association of Crime Analysts (IACA), the International Association of Chiefs of Police (IACP), and the International Association for Healthcare Security & Safety (IAHSS). He previously served as President of the IAPSC and as Chair of both the IAHSS Foundation's Evidence-Based Research Committee and the IAPSC's Evidence-Based Security Practices Committee. He currently serves as a member of the IAPSC Forensic Committee. In 2025, Karim was honored with the Charles A. Sennewald Distinguished Service Accolade by the IAPSC in recognition of his contributions to the security consulting profession.



**MATERIALS RECEIVED**

In forming the opinions and analyses contained in this report, I reviewed the following materials:

1. Complaint and Demand for Jury Trial

2. Prostitution and Human Sex Trafficking SOP (Bates RR-ESA001434–RR-ESA001436)

3. ESA Policies and SOPs (RR-ESA000300 through RR-ESA001472)

7. AHLA Human Trafficking Training Module (Bates RR-ESA001434–RR-ESA001471)

8. Property Deeds, Merger Agreements, and Management Agreements (Bates RR-ESA000001–RR-ESA000275)

9. Property Layout Maps (Bates RR-ESA001491–RR-ESA001495)

10. Agreements with Hospitality Risk Controls and Hospitality Safety & Security Services (Bates RR-ESA001473–RR-ESA001479)

11. Employee Lists (Relevant Period 2009–2015) (Bates RR-ESA001496–RR-ESA001502)

12. RR Folios and Reservation Records (Bates RR-ESA001503–RR-ESA001543)

13. Internal Incident Reports (Bates RR-ESA001544–RR-ESA001566)

14. Medallia Guest Reviews and Complaint Reports (Bates RR-ESA001567–RR-ESA001859)

15. Property Management System Records and Related Documentation as referenced in discovery responses

16. ESA P Portfolio L.L.C. Responses to Plaintiff's First Set of Interrogatories



17. ESA Management, LLC Responses to Plaintiff's First Set of Interrogatories

18. Plaintiff R.R.'s Responses to ESA Management, LLC's First Set of Interrogatories

19. ESA P Portfolio L.L.C. Responses to Plaintiff's First Request for Production of Documents

20. ESA Management, LLC Responses to Plaintiff's First Request for Production of Documents

21. 1510 Incident Reports (Ft. Lauderdale, 2009–2015)

22. 9638 Incident Reports (Tamarac, 2009–2015)

25. Plaintiff's Expert Disclosures

26. 2015 Budget P&L ESA Site 1510 and Site 9638

27. 2009-2015 ESA Site 9638 Security Invoices and Payments

28. 2009-2015 Calls for Service for ESA Site 1510 and Site 9638

Consistent with the *Forensic Methodology*, I personally requested, but not have not yet received, crime records (Offense List or in the alternative, Calls for Service) from Broward County Sheriff's Office and the Fort Lauderdale Police Department for the properties at issue in this matter. To date, those records have not been received. Although ESA's counsel produced certain crime records, specifically Calls for Service, the corresponding Offense/Incident Reports were not provided. Based on the Calls for Service produced, I have requested the related Offense/Incident Reports, which have not yet been received.

On February 12, 2026, I interviewed Michael Conlon, ESA's Vice President of Safety and Security to learn more about the security program in place at ESA properties during the applicable time period. Findings based on this interview are cited throughout this report as *Conlon Interview, 2/12/26*.



**DEFINITIONS**

The Trafficking Victims Protection Act of 2000 and its subsequent reauthorizations defines ***Sex Trafficking*** as the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purpose of a commercial sex act in which a commercial sex act is induced by force, fraud, or coercion, or in which the person induced to perform such act has not attained 18 years of age.[1]

In January 2013, the Federal Bureau of Investigation (FBI) Uniform Crime Reporting (UCR) Program began collecting offense and arrest data regarding human trafficking as required by the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA). Section 237 of the 2008 TVPRA[2] required the FBI to collect human trafficking offense data and to distinguish between prostitution, assisting or promoting prostitution, and purchasing prostitution.[3]

The Federal Bureau of Investigation (FBI) defines ***Human Trafficking - Commercial Sex Acts*** as inducing a person by force, fraud, or coercion to participate in commercial sex acts, or in which the person induced to perform such act(s) has not attained 18 years of age.[4]

In contrast, the FBI defines the following prostitution-related offenses:[5]

- Prostitution Offenses - To unlawfully engage in or promote sexual activities for anything of value.

- Prostitution - To engage in commercial sex acts for anything of value.

- Assisting or Promoting Prostitution - To solicit customers or transport persons for prostitution purposes; to own, manage, or operate a dwelling or other establishment for the purpose of providing a place where prostitution is performed; or to otherwise assist or promote prostitution.

- Purchasing Prostitution - To purchase or trade anything of value for commercial sex acts.

---

[1] https://www.justice.gov/humantrafficking

[2] https://www.congress.gov/110/plaws/publ457/PLAW-110publ457.pdf

[3] https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/additional-data-collections/human-trafficking

[4] https://ucr.fbi.gov/nibrs/2018/resource-pages/nibrs_offense_definitions-2018.pdf

[5] https://ucr.fbi.gov/nibrs/2018/resource-pages/nibrs_offense_definitions-2018.pdf



Human trafficking, including sex trafficking, is a process crime (rather than a single offense) that consists of four distinct phases:

1. Deception, abduction, or recruitment
2. Transportation
3. Exploitation
4. Victim disposal[6]



The exploitation phase occurs in different types of places and often occurs in multiple places. It can occur in hotels, residences, other places (e.g. massage parlors, truck stops, bars, strip clubs, etc.), or in public places (e.g. parks, streets, etc.).



---

[6] Aronowitz, Alexis; Gerda Theuermann and Elena Tyurykanova (2010). Analysing the Business Model of Trafficking in Human Beings to Better Prevent the Crime. Office of the Special Representative and Coordinator for Combating Trafficking in Human Beings.



Sex trafficking is a transient[7] and clandestine[8] crime. Unlike robbery, which most often occurs in public spaces with victims willing to report the crime, sex trafficking exploitation most often occurs in private spaces, making it difficult to detect and prevent.[9] [10] [11] [12] [13]

Human Trafficking (Commercial Sex Acts) is more likely to occur in Residences/Homes (38.2%) according to the Federal Bureau of Investigation (FBI) for 2013 to 2024. As illustrated in the image below from the FBI's Crime Data Explorer,[14] Hotels/Motels were the location of 23.8% of Human Trafficking (Commercial Sex Acts).

---

[7] Transient - lasting only for a short time; impermanent (Oxford Languages); passing especially quickly into and out of existence (Merriam-Webster)

[8] Clandestine - kept secret or done secretively, especially because illicit (Oxford Languages); marked by, held in, or conducted with secrecy (Merriam-Webster)

[9] Newman, Graeme R. (2006). The Exploitation of Trafficked Women, Problem-Oriented Guides for Police Problem-Solving Tools Series No. 38. Office of Community Oriented Policing Services. U.S. Department of Justice.

[10] Finckenauer, James O., Ko-lin Chin (2010). Sex trafficking: A target for situational crime prevention? Situational prevention of organised crimes. Willan Publishing.

[11] Jeng, Chu-Chuan, Edward Huang, Sarah Meo, and Louise Shelley. 2022. "Combating Sex Trafficking: The Role of the Hotel—Moral and Ethical Questions" Religions 13, no. 2: 138.

[12] Federal Bureau of Investigation Crime Data Explorer: https://cde.ucr.cjis.gov/LATEST/webapp/

[13] Farboudi-Jahromi, M., Tasci, A. D. A., & Sönmez, S. (2022). Employees' helping behavior toward the victims of human trafficking in the lodging industry. International Journal of Contemporary Hospitality Management, 35(1), 1–30. https://doi.org/10.1108/IJCHM-04-2022-0454

[14] https://cde.ucr.cjis.gov/LATEST/webapp/#/pages/explorer/crime/crime-trend



## Location Type

Sort By: **Category**

| | | |
|---|---|---|
| Residence/Home | 4,342 | |
| Hotel/Motel/Etc. | 2,705 | |
| Other/Unknown | 1,251 | |
| Highway/Road/Alley/Street/Sidewalk | 1,157 | |
| Cyberspace | 444 | |

| Location | Count (2013-2024) | Percent (2013-2024) |
|---|---|---|
| Residence/Home | 4342 | 38.20% |
| Hotel/Motel/Etc. | 2705 | 23.80% |
| Other/Unknown | 1251 | 11.00% |
| Highway/Road/Alley/Street/Sidewalk | 1157 | 10.20% |
| Cyberspace | 444 | 3.90% |
| Parking/Drop Lot/Garage | 271 | 2.40% |
| Park/Playground | 148 | 1.30% |
| Commercial/Office Building | 146 | 1.30% |
| Government/Public Building | 133 | 1.20% |
| School-Elementary/Secondary | 126 | 1.10% |
| Gambling Facility/Casino/Race Track | 70 | 0.60% |
| Restaurant | 67 | 0.60% |
| Drug Store/Doctor's Office/Hospital | 59 | 0.50% |
| Bar/Nightclub | 45 | 0.40% |
| Specialty Store | 45 | 0.40% |
| Convenience Store | 44 | 0.40% |
| Air/Bus/Train Terminal | 42 | 0.40% |
| Service/Gas Station | 40 | 0.40% |
| Field/Woods | 32 | 0.30% |
| Department/Discount Store | 26 | 0.20% |
| School/College | 18 | 0.20% |
| Shopping Mall | 16 | 0.10% |
| Tribal Lands | 16 | 0.10% |
| Jail/Prison/Penitentiary/Corrections Facility | 14 | 0.10% |



THREAT ANALYSIS GROUP

| | | |
|---|---|---|
| Shelter-Mission/Homeless | 14 | 0.10% |
| Church/Synagogue/Temple/Mosque | 11 | 0.10% |
| Grocery/Supermarket | 11 | 0.10% |
| Abandoned/Condemned Structure | 9 | 0.10% |
| Industrial Site | 8 | 0.10% |
| School-College/University | 7 | 0.10% |
| Rental Storage Facility | 6 | 0.10% |
| Camp/Campground | 5 | 0.00% |
| Lake/Waterway/Beach | 5 | 0.00% |
| Bank/Savings and Loan | 4 | 0.00% |
| Community Center | 4 | 0.00% |
| Liquor Store | 4 | 0.00% |
| Construction Site | 3 | 0.00% |
| Rest Area | 2 | 0.00% |
| Arena/Stadium/Fairgrounds/Coliseum | 1 | 0.00% |
| Auto Dealership New/Used | 1 | 0.00% |
| Dock/Wharf/Freight/Modal Terminal | 1 | 0.00% |
| Military Installation | 1 | 0.00% |
| Amusement Park | 0 | 0.00% |
| ATM Separate from Bank | 0 | 0.00% |
| Daycare Facility | 0 | 0.00% |
| Farm Facility | 0 | 0.00% |
| Not Specified | 0 | 0.00% |
| **Total** | **11354** | **100%** |



## SEX TRAFFICKING VICTIM IDENTIFICATION

**I am not offering any opinion on Plaintiff's status as a victim of sex trafficking.** Rather, the information below is provided to establish professional context for understanding sex trafficking-related indicators ("red flags") within the domains of security operations and hotel place management. Place Management is an crime prevention approach which includes strategies and actions undertaken by individuals (e.g., landlords, property managers, or designated staff) responsible for maintaining order and ensuring the smooth operation of a property.[15][16][17][18][19][20][21] This includes an explanation of sex-trafficking patterns and dynamics, a description of commonly recognized behavioral and environmental indicators, a discussion of hotel-industry training and operational practices, and a comparison of general trafficking scenarios relevant to lodging environments. Additionally, this context includes a critique of the research quality underlying commonly cited anti-trafficking programs, as well as a clarification of the distinctions between prostitution and sex trafficking as defined in criminological and operational-security literature. The purpose of this discussion is to support the evaluation of hotel security practices and situational awareness, not to offer any conclusion regarding CLF individually.

Scientific research is a critical step for such understanding and appropriate trafficking countermeasures in hotels; however, most human trafficking studies focus on victims' experiences, with little attention to hotel employees' perspectives.[22]

---

[15] Eck, J. E. (2010). Places and the crime triangle. In Encyclopedia of criminological theory (Vol. 1, pp. 281–284). SAGE Publications. https://study.sagepub.com/system/files/Eck%2C_John_E._-_Places_and_the_Crime_Triangle.pdf

[16] Madensen, T. D., & Eck, J. E. (2013). Crime places and place management. In F. T. Cullen & P. Wilcox (Eds.), The Oxford handbook of criminological theory. Oxford University Press.

[17] Eck, J. E., & Madensen-Herold, T. D. (2018). Place management, guardianship, and the establishment of order in deterrence, choice, and crime. In D. S. Nagin, F. T. Cullen, & C. L. Jonson (Eds.), Advances in criminological theory (Vol. 23, pp. 269–308). Routledge.

[18] Bruinsma, G., Johnson, S. D., Eck, J. E., & Madensen, T. D. (2018). Place management. In The Oxford handbook of environmental criminology. Oxford University Press.

[19] Eck, J. E. (2018). Regulation for high-crime places: Theory, evidence, and principles. The ANNALS of the American Academy of Political and Social Science, 679(1), 106–120. https://doi.org/10.1177/0002716218778764

[20] Douglas, S., & Welsh, B. C. (2020). Place managers for crime prevention: The theoretical and empirical status of a neglected situational crime prevention technique. Crime Prevention and Community Safety, 22(2), 99–109.

[21] Eck, J. E., Linning, S. J., & Herold, T. D. (2023). Place management and crime: Ownership and property rights as a source of social control. Springer.

[22] Farboudi-Jahromi, M., Tasci, A. D. A., & Sönmez, S. (2022). Employees' helping behavior toward the victims of human trafficking in the lodging industry. International Journal of Contemporary Hospitality Management, 35(1), 1–30. https://doi.org/10.1108/IJCHM-04-2022-0454



"Domestic Minor Sex Trafficking (DMST), or the recruitment, harboring, transportation, or receipt of persons under 18 years of age for the purpose of commercial sexual exploitation (Victims of Trafficking and Violence Protection Act, 2000), is notoriously difficult to identify."[23] Sex trafficking victims may not self-report, may not ask for help, and may not see themselves as victims.[24] As such, sex trafficking victims are difficult to identify and are frequently misidentified.[25] [26] [27]

Various governmental (e.g. Department of Homeland Security's Blue Campaign) and non-governmental (e.g. Polaris) organizations have proposed lists of behavioral or situational "red flags" that are purported to signal possible sex trafficking. However, these indicators remain largely speculative. To date, there is no empirical evidence demonstrating that commonly cited indicators have adequate specificity (ability to correctly identify non-trafficking situations) or sensitivity (ability to correctly identify actual trafficking victims). In fact, multiple reviews have found that most indicator lists—including those disseminated through public-facing campaigns—were developed without validation studies, rely on anecdotal practitioner experience, and risk generating substantial false positives. As a result, these indicators should be interpreted with caution and are

---

[23] Winks, Kaitlin M. H., Georgia M. Lundon, Hayden M. Henderson & Jodi A. Quas (2022) Laypersons' recognition of and attribution of blame in situations involving domestic minor sex trafficking, Psychology, Crime & Law, DOI: 10.1080/1068316X.2022.2139377

[24] Toney-Butler, TJ, Mittel O. Human Trafficking. 2020 Nov 27. In: StatPearls [Internet]. Treasure Island (FL): StatPearls Publishing; pg 1–57; 2020 Jan–. PMID: 28613660

[25] Vellani, Karim H., & Kristof, Tina S. (2022). "Security's Critical Role in Combating Sex Trafficking." Journal of Healthcare Protection Management, Volume 76, Number 1, International Association for Healthcare Security & Safety.

[26] Vellani, Karim H., & Kristof, Tina S. (2021). Identifying and Responding to Sex Trafficking Victims in Healthcare Environments. CrimRxiv. https://doi.org/10.21428/cb6ab371.84ddfc71

[27] Tortolero, G.A. (2020). Human Trafficking Victim Identification and Response Within the United States Healthcare System. IAHSS-F RS-20-02. International Association for Healthcare Security and Safety – Foundation. https://iahssf.org/research/human-trafficking-victim-identification-and-response-within-the-united-states-healthcare-system/



insufficient, standing alone, to reliably identify sex trafficking in real-world settings.[28] [29] [30] [31] [32]

The Department of Homeland Security (DHS) Blue Campaign[33] provides the following indicators of **potential victims**:

*Does the individual...*
- *Appear to be deprived of food, water, sleep, basic hygiene, medical care, or other necessities?*
- *Act fearful, anxious, depressed, submissive, tense, nervous/paranoid, or disassociated/ "checked out"?*
- *Have bruises or other signs of physical trauma?*
- *Have tattoos or scars that would indicate branding by a trafficker?*
- *Have scars, cut marks, burns, or other signs of self-harm/suicidal tendencies?*
- *Defer to another person to speak for them?*
- *Appear to be coached on what to say, or their responses seem rehearsed?*
- *Have a difficult time providing logical answers to basic questions?*
- *Appear to be traveling with few or no personal items, such as luggage or other bags?*
- *Exhibit evidence of verbal threats, emotional abuse, or being treated in a demeaning way?*
- *Seem to be with a "boyfriend," "girlfriend," or romantic partner who is noticeably older?*
- *Appear to be with a group of girls traveling with an older male or female?*
- *Dress inappropriately for their age, or in out-of-season clothing?*
- *Appear to have no control over their money and/or ID?*
- *Reference someone in their group being their "sugar daddy/sugar momma," or refer to themselves as*
- *a "sugar baby"?*

---

[28] Boyer, C. B., Greenbaum, J., & Walker, B. (2020). A systematic review of validated screening tools for human trafficking. Journal of Adolescent Health, 66(2), 152–159

[29] Lederer, L. J., & Wetzel, C. A. (2014). The health consequences of sex trafficking and their implications for identifying victims in healthcare facilities. Annals of Health Law, 23(1), 61–91

[30] Powell, C., Dickins, K., & Stoklosa, H. (2017). Training US health care professionals on human trafficking: where do we go from here? Medical Education Online, 22(1), 1–8

[31] U.S. Government Accountability Office (GAO). (2021). Human trafficking: Agencies have taken steps to assess prevalence but face challenges. GAO-21-385

[32] Farrell, A., Dank, M., de Vries, I., Kafafian, M., Hughes, A., & Lockwood, S. (2020). Failing victims? Challenges of the police response to human trafficking. Criminology & Public Policy, 19(3), 649–671

[33] U.S. Department of Homeland Security. (2025). Blue Campaign: Human trafficking response guide for the hospitality industry. U.S. Department of Homeland Security. https://www.dhs.gov/blue-campaign



- *Reference traveling to other cities or towns frequently?*
- *Talk about getting paid very little or not at all for the work they do?*
- *Appear to not have freedom of movement?*

  *No single indicator is proof that human trafficking is occurring*

Further, the Blue Campaign provides the following indicators of **potential traffickers**:[34]

*Does the individual...*
- *Use verbal threats, emotional abuse, or demeaning speech toward guests?*
- *Limit guests' access to their possessions, including identification documents?*
- *Appear to restrict the movement or social interaction of their guests?*
- *Reserve multiple rooms or have an excessive number of people staying in the room?*
- *Use the "Do Not Disturb" sign constantly or refuse cleaning services for multiple days?*
- *Leave the room infrequently, not at all, or at odd hours?*[35] [36]

The Blue Campaign[37] provides the following Indicators of Human Trafficking for Concierge, Bellhop, Front Desk, Security, and Valet Staff:

Does the guest…
- Appear distressed, disoriented, or have visible injuries?
- Not know the hotel name or area where they are?
- Reserve multiple rooms?
- Pay for their room with cash or pre-loaded credit card?
- Use hotel computers for adult-oriented or sexually explicit websites?
- Seem unforthcoming about their full name, home address, or vehicle information when registering?
- Appear to be a minor taking on adult roles or behaving older than their actual age (paying bills or
- requesting services)?
- Appear with a minor that he or she did not come with originally?
- Rent pornography when children are staying in the room?

---

[34] U.S. Department of Homeland Security. (n.d.). Sex trafficking indicators in the hospitality industry pocket card. U.S. Department of Homeland Security. https://www.dhs.gov/bluecampaign

[35] https://www.dhs.gov/blue-campaign/publication/materials/private-industry-indicator-cards

[36] https://www.dhs.gov/sites/default/files/2023-07/BC_HospitalityIndicatorCard_508c.pdf

[37] U.S. Department of Homeland Security. (2025). Blue Campaign: Human trafficking response guide for the hospitality industry. U.S. Department of Homeland Security. https://www.dhs.gov/blue-campaign



- Have repeated visitors over a period of time, particularly those dropped off at the hotel?
- Leave room frequently, not at all, or at odd hours?
- Appear to be a minor with the patron late at night or during school hours (not on vacation)?
- Have no identification or use an ID that is not theirs?
- Rent the room by the hour, for less than a day, or for a long-term stay that does not appear normal?
- Request information or access to adult services or the sex industry?
- Rent a room with fewer beds than patrons?
- Sell items to or beg from other patrons or staff?
- Enter/exit through the side or rear entrances instead of the lobby or attempt to prop open exit doors?
- Park their car in the parking lot so that the license plate is not visible?

The Blue Campaign[38] provides the following Indicators of Human Trafficking for Housekeeping, Maintenance, and Room Service Staff

Does the guest…
- Use the "Do Not Disturb" sign constantly?
- Request additional towels, new linens, etc. multiple times a day but deny hotel/motel staff entry
- into the room?
- Refuse cleaning services for multiple days?
- Keep excessive amounts of cash in the room?
- Possess multiple computers, cell phones, credit card readers, or other technology?
- Reserve multiple rooms?
- Leave the room infrequently, not at all, or at odd hours?
- Possess children's items or clothing without having a child registered with the room?
- Loiter in the hallways and appear to monitor the area?
- Keep excessive amounts of alcohol or illegal drugs in their room?
- Possess evidence of pornography or sex paraphernalia (condoms, lubricant, lotion, etc.)?
- Leave minors alone in their room for long periods of time?
- Have an excessive number of people staying in their room?
- Stay for an extended period of time with few or no personal possessions?
- Allow a constant flow of people into a room at all hours?
- Keep their room stocked with merchandise, luggage, mail packages, and purses/wallets with
- different names?

---

[38] U.S. Department of Homeland Security. (2025). Blue Campaign: Human trafficking response guide for the hospitality industry. U.S. Department of Homeland Security. https://www.dhs.gov/blue-campaign



- Loiter in the parking lot, lobby, or hallways and return to the room after a visitor leaves?

Existing literature identifies "Do Not Disturb" signs as warning indicators rather than validated interventions, and no peer-reviewed studies were found that measure the impact of inspecting such rooms or refusing cleaning access as an anti-trafficking countermeasure.

Polaris identifies the following *Trafficking Indicators in Hotels & Motels*:

*In-call Escort Services*
- *Pays for hotel in cash or with pre-paid credit card*
- *Extended stay with few possessions*
- *Short stay with excessive luggage*
- *Initial reservation is for one night, but extended day by day*
- *Requests room overlooking parking lot or not within view of front desk*
- *Presence of excessive drugs or sex paraphernalia*
- *Excessive condoms in trash cans*
- *Frequently asks for new towels, washcloths, and/or linens*
- *Excessive foot traffic in/out of rooms*
- *Checks in alone but requests two beds, two keys, etc.*
- *Multiple rooms under one name*
- *One person (or couple) checking in with several females*

*Out-call Escort Services*
- *Staff observes the same female(s) on different visits with different men*
- *Guest is overly concerned with surveillance cameras or entrance policies*
- *Female is dropped off and visits for 30 minutes -1 hour only*
- *Someone waits on-site (e.g. in parking lot) for female*
- *Room is booked with business card but is paid in cash*[39]

A 2022 *Police Chief* article regarding online escort ads demonstrated that "the indicators typically relied upon by officers as 'red flags' for trafficking do not necessarily predict trafficking." The article stated, "the indicators had not been empirically tested against

---

[39] Polaris (2018). On-Ramps, Intersections, and Exit Routes: A Roadmap for Systems and Industries to Prevent and Disrupt Human Trafficking



cases negative for trafficking to assess their true predictive power; rather, their accuracy was assumed."[40] [41]

I am not aware of any evidence-based research supporting the "indicia of sex trafficking" promoted by the Department of Homeland Security's (DHS) Blue Campaign or Polaris, the nonprofit organization that operates the National Human Trafficking Resource Center and Hotline in hotels. Nonetheless, Polaris recommends asking the following invasive questions to identify potential sex trafficking victims:

- Did anyone ever pressure you to engage in any sexual acts against your will?

- Did anyone ever take photos of you and if so, what did they use them for? Were these photos ever sent to other people or posted on an online forum (Craigslist, Backpage, Myspace)?

- Did anyone ever force you to engage in sexual acts with friends or business associates for favors/money?

- Did anyone ever force you to engage in commercial sex through online websites, escort services, street prostitution, informal arrangements, brothels, fake massage businesses or strip clubs?

- Were you required to earn a certain amount of money/meet a nightly quota by engaging in commercial sex for someone? What happened if you did not meet this quota?

- [For women only] Did anyone force you to continue to engage in commercial sex when you were on your period? Were you ever asked or told to use anything that would prevent the flow of menstruation?

- How old were you when you were in this situation? Did you ever see any minors (under 18 years old) involved in commercial sex?

- Were you ever transported to different locations to engage in commercial sex? Where were you taken and who transported you?

---

[40] Lugo-Graulich, Kristina A. et al., "Debunking Conventional Wisdom: Using Online Escort Ads in Sex Trafficking Investigations," Police Chief 89, no. 10 (October 2022): 40-47. https://www.ojp.gov/library/publications/debunking-conventional-wisdom-using-online-escort-ads-sex-trafficking

[41] Lugo-Graulich, K., Meyer, L. F., Souza, K., Tapp, S. N., Maryfield, B., & Bostwick, L. (2024). Improving Sex Trafficking Victim Identification: Indicators of Trafficking in Online Escort Ads. Journal of Human Trafficking, 1–22. https://doi.org/10.1080/23322705.2024.2349447



- Who decided whether or not you used a condom during sex acts?[42]

Several studies have shown that over 80% of human trafficking victims interact with the healthcare system in some capacity while trafficked.[43] [44] [45]  Sex trafficking victims may visit healthcare facilities for a multitude of emergent medical conditions including sexually transmitted infections and pregnancy-related issues.[46]  Healthcare workers have an opportunity to identify and respond to trafficking victims in ways that are not possible for workers in other industries.[47] [48] [49]  Healthcare workers can create a safe space for victims to self-identify, review the patient's medical records, conduct a physical examination, and use an evidence-based trafficking victim screening tool.

Healthcare workers can ask invasive screening questions, such as:

1. Have you been to see a nurse, doctor or other health provider in the last year?

2. Have you ever broken any bones or had any cuts that needed stitches?

3. Have you ever been knocked unconscious ("knocked out")?

4. Have you ever run away from home or been 'kicked out' of your home?

5. Have you used drugs or alcohol in the last 12 months?

---

[42] https://humantraffickinghotline.org/en/resources/comprehensive-human-trafficking-assessment-tool

[43] Tortolero, G.A. Human Trafficking Victim Identification and Response Within the United States Healthcare System, Evidence Based Healthcare Security Research Series.  IAHSS-F RS-20-02. International Association for Healthcare Security and Safety - Foundation (2020).

[44] Toney-Butler, TJ and O. Mittel, Human Trafficking. 2020 Nov 27. In: StatPearls [Internet]. Treasure Island (FL): StatPearls Publishing; pg 1–57; 2020 Jan–. PMID: 28613660

[45] American Hospital Association, *Human Trafficking*, https://www.aha.org/topics/human-trafficking (accessed 4/27/21).

[46] Baldwin, Susie, David Eisenman, Jennifer Sayles, Gery Ryan, and Kenneth Chuang, Kenneth, Identification of Human Trafficking Victims in Health Care Settings, Health and Human Rights,13. E36-49 (2011).

[47] Tortolero, G.A. Human Trafficking Victim Identification and Response Within the United States Healthcare System, Evidence Based Healthcare Security Research Series.  IAHSS-F RS-20-02. International Association for Healthcare Security and Safety - Foundation (2020).

[48] Clawson, Heather J., Nicole Dutch, and Amy Solomon, Human Trafficking Into and Within the United States: A Review of the Literature, United States Department of Health and Human Services, Office of the Assistant Secretary for Planning and Evaluation (2009). https://aspe.hhs.gov/system/files/pdf/75891/index.pdf

[49] Jouk, Natasha, Ivana Capin, Jordan Greenbaum, and Dana Kaplan, Recognizing Suspected Human Trafficking in the Pediatric Intensive Care Unit, Journal of Human Trafficking (2021), DOI: 10.1080/23322705.2020.1862614



6.  If yes, do you remember how old you were when you first tried alcohol or drugs?

7.  Have you ever had any problems with the police?

8.  **Has a boyfriend or girlfriend in a dating or serious relationship ever physically hurt you or threatened to hurt you (hit, pushed, kicked, choked, burned or something else)?**

9.  Have you ever had sex of any type?

10. If yes, when you had sex, what did it involve (vaginal, anal, oral)

11. Since the first time you had sex, how many partners have you had?

12. Which of the following best describes you?  (Heterosexual (straight), Homosexual (Gay or Lesbian), Bisexual, Transgender, Not sure

13. Have you ever had any sexually transmitted infections, like herpes, gonorrhea, chlamydia or trichomonas?

14. **Have you ever traded sex for money, drugs, a place to stay, a cell phone, or something else?**

15. **Has a boyfriend, a girlfriend or anyone else ever asked you, or forced you to have sex with another person?**

16. **Has anyone ever asked or forced you to do some sexual act in public, like dance at a bar or a strip club? (If asked, did you have to actually do it?)**

17. **Has anyone ever asked you to pose in a sexy way for a photo or a video?**[50]

Likewise, healthcare workers may recognize physical indicators during their questioning of suspected victims.  While these indicators are often exhibited by non-victim patients, coupled with the screening questions above and a physical examination, they may supplement the trafficking victim identification protocol.  Indicators may include:

1.  Inconsistent history or a history that appears coaxed. May be difficult to determine if a language barrier is present.

2.  **Resistant to answer questions about the injury or incident.**

---

[50] Tortolero, G.A. Human Trafficking Victim Identification and Response Within the United States Healthcare System, Evidence Based Healthcare Security Research Series.  IAHSS-F RS-20-02. International Association for Healthcare Security and Safety - Foundation (2020).



3. Avoids eye contact, is nervous, fearful of touch.

4. **No idea of address or general area where they live.**

5. **No control over their finances and lacks decision-making capacity.**

6. **Accompanied by a controlling companion or family member that refuses to let the patient speak for themselves or be alone for care or insists on being the translator.**

7. Exhibits bizarre, hostile behavior. Resistant to care and assistance. May have initially consented but changes mind after asked to undress for an exam.

8. No identification or a companion has it in their possession.

9. **Under age 18 and involved in a commercial sex act.**

10. **Tattoos or branding signs.**

11. **Multiple sex partners.**

12. Inappropriate attire for the environmental conditions of the area.

13. **Attempt to reason away bruises or ligature marks by claiming a bruising or rare blood disorder.**

14. **Silent, afraid to speak, cringes at the sound of a loud voice.**

15. **Uses trafficking "lingo" such as "the life" or other words common in the commercial sex industry.**

16. Has addiction issues such as opioids.

17. **Admits to a forced sexual encounter or being forced into sex acts.**

18. Has a cover story to avert suspicion, but details may vary or be inconsistent with a query.[51]

Healthcare workers can separate victims from traffickers during the medical examination and create an environment that enables victims to self-identify or request help. For example, signage in patient-only bathrooms can instruct victims to communicate their need for help non-verbally (e.g. flip a sign over, affix a colored dot to a urine collection cup, leave a note, etc.).

---

[51] Toney-Butler, TJ and O. Mittel, Human Trafficking. 2020 Nov 27. In: StatPearls [Internet]. Treasure Island (FL): StatPearls Publishing; pg 1–57; 2020 Jan–. PMID: 28613660



Identifying and helping victims of human trafficking is difficult and can further endanger the victim.[52] Unlike healthcare environments, hotels like ESA, are not well-situated to identify victims of sex trafficking.

---

[52] Davy, D. (2016). Anti–Human Trafficking Interventions: How Do We Know if They Are Working? American Journal of Evaluation, 37(4), 486–504. https://doi.org/10.1177/1098214016630615



*RR v. ESA P Portfolio L.L.C.*

**SUBJECT PLACE CHARACTERIZATION**

The Extended Stay America (ESA) properties at issue in this matter include Site 1510 located at 3031 W Commercial Blvd, Fort Lauderdale, FL 33309[53] and Site 9638 located at 3873 W Commercial Blvd, Tamarac, FL 33309.[54]  Both hotels have exterior corridors and at least one staff member on duty 24x7. Beyond guest room sales, both hotels generated revenue from laundry machines and vending machines which sold food and drinks and did not sell sexual paraphernalia.[55] ESAs business model is guests who stay 30 days.  60% of the guests stay in excess of 30 nights.  A guest staying 37 days would not be unusual.[56]

---

[53] https://maps.app.goo.gl/ojTVaVqg3PA9GNnd8

[54] https://maps.app.goo.gl/FhYDyZxJb4mT5UCa6

[55] ESA Management, LLC Responses to Interrogatories

[56] Conlon Interview, 2/12/26



## SUBJECT INCIDENT BACKGROUND

Plaintiff RR has not been deposed in this matter and no police reports associated with RR's stays at either ESA property at issue has been provided. As such, there is limited information regarding her allegations and stays at ESA Site 1510 and Site 9638. Folios for RR's stays at ESA Site 1510 and Site 9638 indicate that her first stay at one of these properties was on July 2, 2012, when she was 18 years old.[57] I have not been provided evidence that "Marrio Fraser ("Ziah") and Jasen Williams, RR's alleged traffickers, were registered guests at ESA Site 1510 or Site 9638.

**I am not offering any opinion on Plaintiff's status as a victim of sex trafficking.**

---

[57] Plaintiff-Specific Folios and Reservation Records (Bates RR-ESA001503–RR-ESA001543)



**CRIME RISK**

**Methodology**

As a security consultant and crime analyst with over 30 years of experience, I have developed specialized expertise in crime analysis and related methodologies. Drawing on this expertise, I have conducted crime risk assessments for private companies, industry groups, and government agencies. I have presented at industry conferences and authored three books, as well as book chapters, articles, and journal papers on crime analysis and security risk mitigation (refer to Appendix A: Curriculum Vitae of Karim Vellani).

In line with my education, training, and professional experience, I applied the Uniform Crime Reporting (UCR) methodology, originally developed by the FBI in 1929, to evaluate crime risk at the . This methodology is widely used by criminologists, security consultants, crime analysts, researchers, and organizations for crime risk assessment and is cited in the peer-reviewed, consensus-based *Forensic Methodology* published by the International Association of Professional Security Consultants (IAPSC).

Analyzing situational and contextual factors in crime is essential for understanding risk patterns (problem analysis) and evaluating the opportunity structures and risk factors that contribute to violence (problem-solving). This comprehensive approach aids in assessing whether the standard of care was upheld or breached.

To evaluate the crime risk at ESA Site 1510 and Site 9638 ("Subject Places"), I analyzed four key factors: **similarity**, **frequency**, **recency**, and **proximity**. This assessment was further guided by industry-accepted practices and authoritative governmental sources.

**Prevalence of Sex Trafficking**

Research indicates that the prevalence of human trafficking, and sex trafficking specifically, is difficult to quantify.

- "Little research has estimated the prevalence of minor sex trafficking in the United States. The existing studies examine different areas and populations and use different categories to estimate the problem. Future research is needed on this important topic, including methodologies to produce more representative estimates of this hard-to-reach population."[58]

---

[58] Franchino-Olsen, H., Chesworth, B. R., Boyle, C., Rizo, C. F., Martin, S. L., Jordan, B., … Stevens, L. (2020). The Prevalence of Sex Trafficking of Children and Adolescents in the United States: A Scoping Review. Trauma, Violence, & Abuse. https://doi.org/10.1177/1524838020933873



- Estimating the prevalence of human trafficking in the United States is extremely difficult. The methods used to derive estimates of human trafficking are rarely described in the literature or government reports.[59]

- United States:  The way US trafficking law is formulated means all commercial sex acts involving minors can effectively be seen as sex trafficking. There are obvious implications for the estimated scale of the problem. Reliable figures on the scale of commercial child sexual exploitation simply do not exist but a much-repeated estimate is that 326,000 children were 'at risk' in 2000.  This figure is regularly misused as a proxy for the scale of internal child sex trafficking, despite having been characterised as 'a guestimate and not a scientific estimate.'[60]

- Statistics concerning human trafficking are necessarily unreliable because of the clandestine nature of the activity and the difficulties in defining it.[61]

- Statistical evidence cited to support claims that sex trafficking is an epidemic are unconvincing.[62]

- The Broward County Sheriff's Office did not report any incidents involving Human Trafficking: Commercial Sex Acts to the FBI between 2013 and 2015.[63] [64]

---

[59] Tortolero, G.A. (2020).  Human Trafficking Victim Identification and Response Within the United States Healthcare System.  Evidence Based Healthcare Security Research Series.  IAHSS-F RS-20-02. International Association for Healthcare Security and Safety - Foundation.

[60] Cockbain, E. (2018). Offender and Victim Networks in Human Trafficking. Abingdon. Routledge.

[61] Newman, Graeme R. (2006).  The Exploitation of Trafficked Women, Problem-Oriented Guides for Police Problem-Solving Tools Series No. 38.  Office of Community Oriented Policing Services.  U.S. Department of Justice.

[62] Cockbain, Ella. (2018). Offender and Victim Networks in Human Trafficking. 10.4324/9781315628578.

[63] Crime Data Explorer, Federal Bureau of Investigation

[64] The Federal Bureau of Investigation began collecting offense and arrest data regarding human trafficking as required by the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 in January 2013.





**Human Trafficking, Commercial Sex Acts Reported by Population**

--●-- Broward County Sheriff's Office Offenses  --●-- Broward County Sheriff's Office Clearances

- The Fort Lauderdale Police Department did not report any incidents involving Human Trafficking: Commercial Sex Acts to the FBI between 2013 and 2015.[65] [66]



**Human Trafficking, Commercial Sex Acts Reported by Population**

--●-- Fort Lauderdale Police Department Offenses  --●-- Fort Lauderdale Police Department Clearances

**Recency and Proximity**

The *Forensic Methodology* addresses both time (**recency**) and distance (**proximity**) in assessing crime at a Place (in this case, ESA Site 1510 and Site 9638), specifically:

---

[65] Crime Data Explorer, Federal Bureau of Investigation

[66] The Federal Bureau of Investigation began collecting offense and arrest data regarding human trafficking as required by the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 in January 2013.



When assessing actual threats, the following may be considered *as deemed relevant by the security expert*:

a. Relevant crimes on the **subject property** for a **three to five-year period** prior to the date of the incident.

b. Relevant crimes in the **immediate vicinity** of the subject property for a **three to five-year period** prior to the date of the incident.[67]

When evaluating current or future crime risk, incidents that occurred further back in time are less relevant because the relationship between past and future offenses is temporally sensitive. Empirical research consistently shows that the likelihood of repeat or nearby crimes declines sharply over time, a phenomenon known as temporal decay or the near-repeat effect. Studies demonstrate that risk is highest within days or weeks following a prior event and diminishes rapidly thereafter.[68] [69] As environmental and social conditions evolve—through tenant turnover, business changes, physical improvements, or shifts in routine activities—the opportunity structures that supported earlier crimes often no longer exist.[70] Consequently, the predictive value of older incidents decreases substantially. Best practices in crime analysis and security risk assessment therefore prioritize recent data, as these incidents more accurately reflect ongoing offender behavior and situational vulnerabilities.[71] [72] [73] Relying heavily on outdated crime data may misrepresent current risk levels and result in disproportionate or misaligned security measures.

In practice, I typically review the three calendar years leading up to the incident and the incident year up to the incident date. However, this timeframe may vary if additional periods are available through discovery or if police departments are unable to provide the entire requested timeframe.

---

[67] See Appendix B (bold added)

[68] Johnson, S. D., & Bowers, K. J. (2004). The stability of space–time clusters of burglary. British Journal of Criminology, 44(1), 55–65.

[69] Johnson, S. D., Bowers, K. J., & Pease, K. (2005). Predicting the future or summarizing the past? Crime mapping as anticipation. In A. Hirschfield & K. Bowers (Eds.), Mapping and analysing crime data: Lessons from research and practice (pp. 179–197). CRC Press.

[70] Brantingham, P. L., & Brantingham, P. J. (1993). Environment, routine, and situation: Toward a pattern theory of crime. In R. Clarke & M. Felson (Eds.), Routine Activity and Rational Choice (pp. 259–294). Transaction Publishers.

[71] Bowers, K. J., Johnson, S. D., & Pease, K. (2004). Prospective hot-spotting: The future of crime mapping? British Journal of Criminology, 44(5), 641–658.

[72] Clarke, R. V., & Eck, J. E. (2005). Crime analysis for problem solvers in 60 small steps. U.S. Department of Justice, Office of Community Oriented Policing Services.

[73] Eck, J. E., & Weisburd, D. (1995). Crime places in crime theory. In J. E. Eck & D. Weisburd (Eds.), Crime and place (pp. 1–33). Criminal Justice Press.



With regard to area crime (**proximity**), the *Forensic Methodology* further states:

    a. *There is no single definition of what constitutes an "immediate vicinity" or "neighborhood" around a given property. Often what is available for evaluation from a law enforcement agency depends upon that agency's software programming and/or staff capabilities (e.g., the agency can only provide data for a set size of an area, such as a quarter mile radius).*

    b. *The IAPSC recognizes that criminology studies and related research have generally found that crime in the area may or may not be relevant to the subject property.*[74]

Advancements in data collection by law enforcement agencies have generated a vast resource for researchers to analyze. Empirical studies of this data have led to the development of three foundational "laws of criminology."

> ***First****, young people—roughly from age 15 through 25—create most of the trouble. **Second**, males cause more trouble than females regardless of age. **Third**, crime is highly concentrated at a few places. This means that even within high-crime areas, like neighborhoods, only a tiny number of places experience crime. There are no known exceptions to this law, unlike the first two laws.*[75]

In criminological research, there is no universally accepted definition of terms like "neighborhood," "area," "immediate area," "immediate vicinity," or "close proximity" (collectively referred to here as "Area").[76] The concept of a "high crime neighborhood" can be misleading, as it assumes that crime-generating factors operate uniformly across the entire Area. If this were the case, crime would be evenly distributed throughout the neighborhood or area. However, this is not accurate. Crime within an Area, such as a neighborhood, is not uniformly spread; certain locations within a neighborhood experience high crime, while most locations have little to no crime. This uneven distribution occurs in both "good" and "bad" neighborhoods alike.

Understanding crime at specific Places is essential for effective crime prevention. Successful crime prevention relies on identifying particular problems and addressing them based on the unique situational characteristics of each property. "Crime-free places

---

[74] See Appendix B

[75] Eck, John E., Shannon J. Linning , Tamara D. Herold (2023). Place Management and Crime: Ownership and Property Rights as a Source of Social Control. SpringerBriefs in Criminology.

[76] Linning, Shannon & Mierzwa, Tyler & Cheung, Jeremy & Eck, John. (2025). What is a neighborhood? A concept consensus review of recent criminological literature. Journal of Criminal Justice. 97. 102370. 10.1016/j.jcrimjus.2025.102370



are all alike; every crime-prone place is crime-prone in its own way." Extensive research, widely accepted since 1989, supports the findings that (a) crime is highly concentrated in specific Places and (b) crime is situationally specific.[77][78][79][80][81][82][83][84][85]

A Place has five characteristics:

1. It is very small (i.e. one address, one land parcel, one building, etc.);

2. It has a known geographic location;

3. It is contained within defined property boundaries;

4. It serves one general function (e.g. the Place provides housing, sells groceries, serves food, provides healthcare, etc.); and

5. It has an owner who has the authority to legally control the use of the Place, including the power to exercise a broad range of controls over the use of the Place.[86]

---

[77] Sherman, L., Gartin, P., & Buerger, M. (1989). Hot spots of predatory crime: Routine activities and the criminology of place. Criminology, 27(1), 27-56. https://doi.org/10.1111/j.1745-9125.1989.tb00862.x

[78] Eck, John E., Shannon J. Linning , Tamara D. Herold (2023). Place Management and Crime: Ownership and Property Rights as a Source of Social Control. SpringerBriefs in Criminology.

[79] Weisburd, David, Elizabeth Groff and Sue-Ming Yang. (2012), The Criminology of Place: Street Segments and Our Understanding of the Crime Problem. Oxford: Oxford University Press.

[80] Madensen, Tamara D. (2010). ""Eck, John E.: Places and the Crime Triangle." Encyclopedia of Criminological Theory, SAGE Publications, Inc., Thousand Oaks.

[81] Madensen, Tamara D. and John E. Eck (2013). "Crime Places and Place Management" in Cullen, F. T., & Wilcox, P. The Oxford Handbook of Criminological Theory. New York, NY: Oxford University Press.

[82] Gotham, K.F. & Kennedy, D.B. Secur J (2019). https://doi.org/10.1057/s41284-019-00218-1

[83] Drawve, Grant & Harris, Casey & Thomas, Shaun & Datta, Jyotishka & Cothren, Jackson. (2020). Current and New Frontiers: Exploring how Place Matters through Arkansas NIBRS Reporting Practices. Crime & Delinquency. 10.1177/0011128720974317.

[84] Weisburd, David, Elizabeth Groff and Sue-Ming Yang. (2012), The Criminology of Place: Street Segments and Our Understanding of the Crime Problem. Oxford: Oxford University Press.

[85] Lee, YongJei & Eck, John. (2023). Measures of Crime concentration for Places and Other Units, in E. R. Groff & C. P. Haberman (Eds.), The Study of Crime and Place: A Methods Handbook, Temple University Press

[86] Eck, John E. (2018). "Regulation for High-Crime Places: Theory, Evidence, and Principles." The ANNALS of the American Academy of Political and Social Science. Volume 679, Issue 1. Sage Publications.



Those unfamiliar with criminological research may use a one-mile radius (3.14 square miles) or a two-mile radius (12.57 square miles) around a Place and mistakenly assume that all crime within this Area contributes directly to the crime risk of that specific Place, disregarding factors like population density. Selecting an arbitrary radius can distort crime analysis, leading to either overestimations or underestimations of risk. This practice is sometimes used simply to create visually appealing maps, rather than for accurate analysis. Research has highlighted key issues associated with using such radii:

> *Few physical targets take the shape of a sphere and so most likely will differ from the morphology of radial buffer. The second issue is that buffer zones tend to be uniform, equidistant from the object they are buffering. Using a concentric buffer zone in this way assumes that diffusion takes place in equal distributions around an object. It does not seem likely, however, that crime would be diffused uniformly.*[87]

In short, relying on arbitrary radii disregards research evidence and presents practical challenges for accurately assessing crime **frequency** (as detailed below).

Analyzing crime across large geographic areas does not align with Routine Activity Theory or other principles in *Crime Science*.[88] Examining crime at broader spatial units rather than specific Places may obscure variations in crime at these locations and misrepresent risk levels.[89] Places are "only loosely coupled to their contexts: they have internal mechanisms that allow them to operate mostly independent from their surroundings."[90] As a result, correlations derived from area-wide data can be misleading when applied to conclusions about individual Places.[91]

Furthermore, research shows that crime in an Area is not *additive* to the crime risk of a Place. However, crime in the Area could be *comparative*, that is, a Place could be compared to other similar Places in the Area.[92] For instance, a retail store could be

---

[87] Murray, R., & Roncek, D. (2008). Measuring diffusion of assaults around bars through radius and agency techniques. Criminal Justice Review, 33(2), 199-220.

[88] Cockbain, E., & Laycock, G. Crime Science. Oxford Research Encyclopedia of Criminology. Retrieved 5 Apr. 2023, from https://oxfordre.com/criminology/view/10.1093/acrefore/9780190264079.001.0001/acrefore-9780190264079-e-4

[89] Weisburd, David, Elizabeth Groff and Sue-Ming Yang. (2012), The Criminology of Place: Street Segments and Our Understanding of the Crime Problem. Oxford: Oxford University Press.

[90] Madensen, Tamara D. and John E. Eck (2013). "Crime Places and Place Management" in Cullen, F. T., & Wilcox, P. The Oxford Handbook of Criminological Theory. New York, NY: Oxford University Press.

[91] Weisburd, David, et al. (2016), Place Matters: Criminology for the Twenty-First Century. Cambridge: Cambridge University Press.

[92] Weisburd, David, et al. (2016), Place Matters: Criminology for the Twenty-First Century. Cambridge: Cambridge University Press.



compared to other Area retail stores with similar characteristics (i.e. sells groceries). Likewise, an apartment community could be compared to similar apartment communities in the Area.  Apartment community characteristics may include type (e.g., garden-style, mid-rise, high-rise), rental rate (e.g., market or subsidized), size (e.g., number of units), and management style.   Comparisons across dissimilar Places, however, are inappropriate. [93] [94] [95]

**Similarity and Frequency**

The United States Department of Justice, specifically the FBI and the Bureau of Justice Statistics ("BJS"), provide guidance regarding the assessment of crime **similarity** and **frequency**.  The FBI collects crime data for specific crimes and categorizes them using the Uniform Crime Report (UCR) methodology.[96] The FBI's UCR methodology categorizes crimes as violent crimes, property crimes, and disorder crimes.[97] The UCR methodology recently transitioned from the Summary Reporting System (SRS) to the National Incident-Based Reporting System (NIBRS). The NIBRS includes Human Trafficking, Commercial Sex Acts and Human Trafficking, Servitude. As discussed in the Definitions section above, the TVPRA requires the FBI to distinguish Human Trafficking - Commercial Sex Acts from prostitution, assisting or promoting prostitution, and purchasing prostitution.[98] [99] There is insufficient extant research to determine if other crimes (e.g. rape, kidnapping, etc.) are indicative of sex trafficking.

More detail is needed for a full understanding of crime patterns. Disaggregating crime allows for a more nuanced understanding of the opportunity structures and risk factors

---

[93] Bruinsma, G., Johnson, S., Eck, J., & Madensen, T. (2018-09-14). Place Management. In The Oxford Handbook of Environmental Criminology. : Oxford University Press.

[94] Eck, John & Guerette, Rob. (2012). "Own the Place, Own the Crime" Prevention. 10.1093/acprof:oso/9780199917938.003.0021.

[95] Vellani, Karim H. (2021).  Unraveled: An Evidence-Based Approach to Understanding and Preventing Crime. Sugar Land, TX: Threat Analysis Group, LLC.

[96] https://ucr.fbi.gov/

[97] A recent enhancement to the UCR's underlying reporting system added a category called crimes against society and added additional crimes to the former categories (e.g. human trafficking). The new enhancements have not been fully operationalized across the country.

[98] https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/additional-data-collections/human-trafficking

[99] https://www.congress.gov/110/plaws/publ457/PLAW-110publ457.pdf



associated with the different forms of crime, ultimately guiding more effective crime prevention strategies tailored to specific situations and locations.[100] [101] [102]

Criminologists Ronald V. Clarke and John E. Eck emphasize that "problems need to be examined with great specificity because small details can make a difference between a set of circumstances that gives rise to harmful events, and a set of circumstances producing harmless events."[103] Regarding *similarity*, Drs. Eck and Clarke state:

> *Similarity. The recurring events must have something in common. They may be committed by the same person, happen to the same type of victim, occur in the same types of locations, take place in similar circumstances, involve the same type of weapon, or have one or more other factors in common. Without common features, you have an arbitrary collection of events, not a problem. Common crime classifications—such as used by the Uniform Crime Reports—are not helpful. Vehicle theft, for example, includes joyriding, thefts for chop shops, thefts for export to other countries, thefts for use in other crimes, and a host of other dissimilar events. So a cluster of vehicle thefts may not be a single problem. More information is needed. With common features, we have a pattern of events that could indicate a problem—for example, thefts of minivans in suburban neighborhoods to be used as gypsy cabs in the inner city.*[104]

The Forensic Methodology states, "The expert may consider the relationship between offenders and victims (e.g. interpersonal, domestic, targeted, etc.)." In assessing a Place's crime risk, it's essential to differentiate between crimes that threaten the general

---

[100] Newton, A., & Felson, M. (2015). Editorial: Crime patterns in time and space: The dynamics of crime opportunities in urban areas. Crime Science, 4(1). doi:10.1186/s40163-015-0025-6

[101] Irvin-Erickson, Y. (2014). Identifying risky places for crime: An analysis of the criminogenic spatiotemporal influences of landscape features on street robberies (Unpublished doctoral dissertation, 2014).

[102] Haberman, C. P., & J.H. Ratcliffe (2015). Testing for temporally differentiated relationships among potentially criminogenic places and census block street robbery counts. Criminology, 53(3), 457-483. doi:10.1111/1745-9125.12076

[103] Clarke, R. V., & Eck, J. E. (2016). Crime analysis for problem solvers in 60 small steps. Office of Community Oriented Policing Services.

[104] Clarke, R. V., & Eck, J. E. (2016). Crime analysis for problem solvers in 60 small steps. Office of Community Oriented Policing Services.



public and those targeting specific individuals. The Department of Justice categorizes crimes by the offender-victim relationship into two types:[105] [106] [107]

   a. "Stranger" (also known as "Stranger-Initiated") is a classification of the victim's relationship to the offender for crimes involving direct contact between the two. Incidents are classified as involving strangers if the victim identifies the offender as a stranger, did not see or recognize the offender, or knew the offender only by sight. Crimes involving multiple offenders are classified as involving non-strangers if any of the offenders was a non-stranger. Since victims of theft without contact rarely see the offender, no distinction is made between strangers and non-strangers for the crime.

   b. "Non-Stranger" (also known as "Interpersonal") is a classification of a crime victim's relationship to the offender. An offender who is either related to, well known to, or casually acquainted with the victim is a non-stranger. For crimes with more than one offender, if any of the offenders are non-strangers, then the group of offenders as a whole is classified as non-stranger. This category only applies to crimes which involve contact between the victim and the offender; the distinction is not made for crimes of theft since victims of this offense rarely see the offenders.

The alleged trafficking of RR is classified as a non-stranger crime based on the Complaint and interrogatory responses in this matter.[108] [109] Non-Stranger crimes, such as domestic violence, are harder to prevent than Stranger crimes, as typical security measures are often ineffective against them.[110] These crimes usually occur in private, unobservable spaces, making them challenging to prevent. Therefore, when assessing crime risk at a

---

[105] Vellani, Karim; Kaufer, Steve; & Army, Christine (2024). A Refined Violent Crime Typology: Analyzing and Solving Specific Types of Violence. ASU Center for Problem Oriented Policing. https://popcenter.asu.edu/sites/default/files/a_refined_violent_crime_typology_vellani_et_al_2024.pdf

[106] Vellani, Karim H. (2021).  Unraveled: An Evidence-Based Approach to Understanding and Preventing Crime. Sugar Land, TX: Threat Analysis Group, LLC.

[107] Bureau of Justice Statistics. (n.d.). Glossary: Stranger; Nonstranger. U.S. Department of Justice. https://bjs.ojp.gov/glossary

[108] Complaint and Demand for Jury Trial

[109] Plaintiff R.R.'s Responses to ESA Management, LLC's First Set of Interrogatories

[110] Vellani, Karim; Kaufer, Steve; & Army, Christine (2024). A Refined Violent Crime Typology: Analyzing and Solving Specific Types of Violence. ASU Center for Problem Oriented Policing. https://popcenter.asu.edu/sites/default/files/a_refined_violent_crime_typology_vellani_et_al_2024.pdf



Place, only prior Stranger crimes should be considered to gauge general crime risk.[111] [112] Criminologist Lawrence W. Sherman states:

> *A standard distinction among violent crimes is the relationship between the victim and the offender. In a crime where the victim and the offender are acquainted, as in a wife-beating, its occurrence may be predictable from their relationship. It is not usually predictable as to place of occurrence, however, especially in public places. There is apparently no reasonable way for the operator of a business to foresee that previously acquainted persons will enter the premises and commit violent acts against each other.*[113]

No scientific basis exists for predicting stranger crimes based on prior non-stranger crime.[114]

**Frequency** is typically measured through crime patterns, trends, and rates:

- Crime Pattern - two or more incidents related by a common causal factor, usually to do with the offender, location, or target.  Patterns are usually, but not always, short term phenomena.[115]

- Crime Trend - a specific type of pattern that has a general direction or tendency.  In practice, a trend often has a time component (e.g. crime by day or week, time of day, etc.) and is represented as an increase or a decrease in a given phenomenon over time.[116]

- Crime Rate - the ratio of crimes in an area to the population of that area.  Crime rates are typically expressed per 1,000 population per year.  A crime rate provides context to a crime volume.[117] "A rate of anything consists of two numbers: the numerator, or number of occurrences, and the denominator, or number of units in

---

[111] St. Jean, Peter K. C.. (2007). Pockets of Crime: Broken Windows, Collective Efficacy, and the Criminal Point of View. University of Chicago Press. https://doi.org/10.7208/chicago/9780226775005.001.0001

[112] Dahmann, J. S. (1975). Examination of police patrol effectiveness-high impact anti-crime program. National Institute of Law Enforcement and Criminal Justice, U.S. Department of Justice.

[113] Sherman, Lawrence W. (1989). Violent Stranger Crime at a Large Hotel: A Case Study in Risk Assessment. Security Journal 1:40-46.

[114] Sherman, Lawrence W. (1989). Violent Stranger Crime at a Large Hotel: A Case Study in Risk Assessment. Security Journal 1:40-46.

[115] International Association of Crime Analysts (2009).  Exploring Crime Analysis, Second Edition. Overland Park:  International Association of Crime Analysts.

[116] Police Executive Research Forum

[117] Vellani, Karim H. and Joel D. Nahoun (2001).  Applied Crime Analysis.  Woburn:  Butterworth-Heinemann.



which the occurrences are possible. Thus, auto accident rates are sometimes described in terms of accidents per 100,000 vehicle miles traveled and plane crash deaths are divided by the number of passenger miles traveled."[118]

**Calls for Service vs. Crimes**

The *Forensic Methodology* mandates the use of Offense/Incident Reports **and** expressly prohibits relying solely on Calls for Service (CFS). The *Forensic Methodology* states:

> *When assessing relevant crimes, Calls for Service should not be used alone. Offense/Incident Reports are necessary to validate the Calls for Service or dispatch logs, specifically the crime type, crime location, and whether a crime actually occurred. Calls for Service alone, in many jurisdictions, are insufficient for these three elements.*

The International Association of Crime Analysts reinforces that CFS are not a reliable indicator of crime, noting that "it is very problematic to use calls for service as a proxy for crime data."[119]

CFS encompass every report of crime, suspected crime, or activity phoned in to the police from a given location. A single incident may generate multiple CFS entries, and many calls involve non-criminal matters such as missing children, traffic accidents, noise complaints, or parking violations. In some cases, criminals deliberately place false emergency calls—known as "swatting"—to divert law enforcement resources away from actual crime scenes. Likewise, legitimate callers may exaggerate the urgency of a situation in an effort to receive a quicker response. Importantly, many CFS do not require a police response at all, and research indicates that roughly half of officers' time spent handling CFS is unrelated to crime.[120] [121] [122] [123] [124]

---

[118] Sherman, Lawrence W. (1989). Violent Stranger Crime at a Large Hotel: A Case Study in Risk Assessment. Security Journal 1:40-46.

[119] International Association of Crime Analysts (2009).  Exploring Crime Analysis, Second Edition. Overland Park:  International Association of Crime Analysts.

[120] Vellani, Karim H. (2021).  Unraveled: An Evidence-Based Approach to Understanding and Preventing Crime. Sugar Land, TX: Threat Analysis Group, LLC.

[121] Klinger, D., & Bridges, G. (1997). Measurement error In Calls-For-Service as an indicator of crime. Criminology, 35, 705-726.

[122] Sherman, L.W., & Cambridge University associates. (2020) How to count crime: The Cambridge Harm Index Consensus. Cambridge Journal of Evidence-Based Policing, 4(1-2), 1–14. https://doi.org/10.1007/s41887-020-00043-2

[123] Ratcliffe, J.H. (2021) Policing and public health calls for service in Philadelphia. Crime Sci 10, 5. https://doi.org/10.1186/s40163-021-00141-0

[124] Langton, S., Verlaan, T. & Ruiter, S. Operationalizing deployment time in police calls for service. Crime Sci 12, 20 (2023). https://doi.org/10.1186/s40163-023-00198-z



Today, many police departments can provide detailed Offense/Incident data, reducing the need to rely on Calls for Service as a measure of crime. When only CFS data are available, however, it is important to recognize that their accuracy varies widely across jurisdictions. For this reason, CFS should not be used in isolation to assess crime risk. Offense/Incident Reports are necessary to confirm whether a crime actually occurred, to verify its type, nature, and location, and to provide the context needed to interpret CFS data reliably.[125] [126]

Broward County Sheriff's Office and the Fort Lauderdale Police Department Calls for Service are particularly challenging to rely on without support of Offense/Incident Reports as they include cancelled calls, unfounded incidents, and incorrect incident types. Broward County Sheriff's Office Calls for Service also include medical calls.

**Analysis of Crime at ESA Site 1510 and Site 9638**
RR's folios indicate she stayed at ESA Site 1510 and Site 9638 on various days starting on July 2, 2012 and ending in April 4, 2015. As such, the operative time period for the crime analysis is January 1, 2009 to April 4, 2015.

In accordance with the *Forensic Methodology* and the techniques described above, I requested crime records from the Broward County Sheriff's Office and the Fort Lauderdale Police Department to assess the general crime threat and specifically the threat of sex trafficking at ESA Site 1510 and Site 9638. As of the date of this report, neither the Broward County Sheriff's Office nor the Fort Lauderdale Police Department has produced the requested records. ESA's counsel produced Calls for Service for ESA Site 1510 and Site 9638; however, the corresponding Offense/Incident Reports were not provided. Based on the Calls for Service produced, I have requested the related Offense/Incident Reports, which have not yet been received. **This report will be supplemented upon receipt of the requested materials, whether produced by the parties or obtained directly from the Broward County Sheriff's Office or the Fort Lauderdale Police Department.**

**Inherent Threats**
The analysis I conducted included the assessment of inherent threats as required by the *Forensic Methodology.* Inherent threats consider "the crime risk at the subject property as determined by the expert based on the property's characteristics, the expert's research and/or experience in similar environments, information gathered through the discovery process, and/or a site inspection (if conducted)." To the extent that hotels provide privacy within guest rooms, there is a possibility that sex trafficking can occur at any type of hotel,

---

[125] Vellani, Karim H. and Joel D. Nahoun (2001). Applied Crime Analysis. Woburn:  Butterworth-Heinemann

[126] Vellani, Karim H. (2021).  Unraveled: An Evidence-Based Approach to Understanding and Preventing Crime. Sugar Land, TX: Threat Analysis Group, LLC.



regardless of economic level (e.g. budget hotels, luxury hotels, etc.) or geographic location.[127] However, the dearth of prevalence data as described above tempers the concern.

Human Trafficking (Commercial Sex Acts) is more likely to occur in Residences/Homes (38.2%) according to the Federal Bureau of Investigation (FBI). As illustrated in the image below from the FBI's Crime Data Explorer,[128] Hotels/Motels were the location of 23.8% of Human Trafficking (Commercial Sex Acts).



| Location of Human Trafficking (Commercial Sex Acts) | Count (2013-2024) | Percent (2013-2024) |
|---|---|---|
| Residence/Home | 4342 | 38.20% |
| Hotel/Motel/Etc. | 2705 | 23.80% |
| Other/Unknown | 1251 | 11.00% |
| Highway/Road/Alley/Street/Sidewalk | 1157 | 10.20% |
| Cyberspace | 444 | 3.90% |
| Parking/Drop Lot/Garage | 271 | 2.40% |
| Park/Playground | 148 | 1.30% |
| Commercial/Office Building | 146 | 1.30% |

---

[127] Paraskevas, Alexandros and Brookes, Maureen (2018) Human trafficking in hotels: an "invisible" threat for a vulnerable industry. International Journal of Contemporary Hospitality Management, 30 (3). pp. 1996-2014. ISSN 0959-611 ORCID: https://orcid.org/0000-0003-1556-5293

[128] https://cde.ucr.cjis.gov/LATEST/webapp/#/pages/explorer/crime/crime-trend



| | | |
|---|---:|---:|
| Government/Public Building | 133 | 1.20% |
| School-Elementary/Secondary | 126 | 1.10% |
| Gambling Facility/Casino/Race Track | 70 | 0.60% |
| Restaurant | 67 | 0.60% |
| Drug Store/Doctor's Office/Hospital | 59 | 0.50% |
| Bar/Nightclub | 45 | 0.40% |
| Specialty Store | 45 | 0.40% |
| Convenience Store | 44 | 0.40% |
| Air/Bus/Train Terminal | 42 | 0.40% |
| Service/Gas Station | 40 | 0.40% |
| Field/Woods | 32 | 0.30% |
| Department/Discount Store | 26 | 0.20% |
| School/College | 18 | 0.20% |
| Shopping Mall | 16 | 0.10% |
| Tribal Lands | 16 | 0.10% |
| Jail/Prison/Penitentiary/Corrections Facility | 14 | 0.10% |
| Shelter-Mission/Homeless | 14 | 0.10% |
| Church/Synagogue/Temple/Mosque | 11 | 0.10% |
| Grocery/Supermarket | 11 | 0.10% |
| Abandoned/Condemned Structure | 9 | 0.10% |
| Industrial Site | 8 | 0.10% |
| School-College/University | 7 | 0.10% |
| Rental Storage Facility | 6 | 0.10% |
| Camp/Campground | 5 | 0.00% |
| Lake/Waterway/Beach | 5 | 0.00% |
| Bank/Savings and Loan | 4 | 0.00% |
| Community Center | 4 | 0.00% |
| Liquor Store | 4 | 0.00% |
| Construction Site | 3 | 0.00% |
| Rest Area | 2 | 0.00% |
| Arena/Stadium/Fairgrounds/Coliseum | 1 | 0.00% |
| Auto Dealership New/Used | 1 | 0.00% |
| Dock/Wharf/Freight/Modal Terminal | 1 | 0.00% |
| Military Installation | 1 | 0.00% |
| Amusement Park | 0 | 0.00% |
| ATM Separate from Bank | 0 | 0.00% |
| Daycare Facility | 0 | 0.00% |
| Farm Facility | 0 | 0.00% |
| Not Specified | 0 | 0.00% |
| **Total** | **11354** | **100%** |



**Awareness**

ESA Policies and SOPs require ESA staff to report incidents, including suspected prostitution/trafficking incidents, via an online portal called Inform. [129] [130] Internal Incident Reports for ESA Site 1510 and Site 9638 do not reflect any incidents of prostitution or sex trafficking.[131]

---

[129] ESA Policies and SOPs (RR-ESA000300 through RR-ESA001472)

[130] Conlon Interview, 2/12/26

[131] Internal Incident Reports (Bates RR-ESA001544–RR-ESA001566)



**CRIME PREVENTION**

In the security field, three main countermeasures mitigate risks: governance (policies, training, protocols), physical security, and security personnel. Some places rely on governance alone, others combine it with physical security, and some use all three. The security program at ESA Site 1510 and Site 9638 used all three elements.



Evidence-based security is the use of research, data, and analysis to inform security decisions. Research that addresses the efficacy of crime prevention measures is more useful than studies that address prevalence of those measures. Efficacy is the ability of crime prevention measures to produce the desired result (i.e., crime reduction).[132] Prevalence, on the other hand, refers to the ubiquity of an intervention.

---

[132] Tompson , L., Belur, J., Thornton, A., Bowers, K. J., Johnson, S. D., Sidebottom, A., Tilley, N. & Laycock, G. (2020). How strong is the evidence base for crime reduction professionals? Justice Evaluation Journal, 4(1), 68-,97. https://doi.org/10.1080/24751979.2020.1818275



Despite the increasing attention to sex trafficking, evidence-based research regarding the indicia of sex trafficking and efficacy of security measures to deter and prevent sex trafficking is limited.[133] [134] [135] [136] [137]

> *There is little in the way of robust, empirically tested best practice about how to counter specific forms of trafficking in specific contexts. The absence of a robust evidence base to inform policy and practice runs a risk of wasting resources on interventions that are well-intentioned but ineffective or, worse yet, actively detrimental. There is a clear need then for more evaluations, perhaps especially of interventions anecdotally considered good practice.*[138]

*Routine Activity Theory* is useful for explaining the basic components of crime. It posits that for a crime to occur, three necessary elements must converge in time: a motivated offender, a target/victim lacking guardianship, and a **Place**.[139] This is illustrated via the inner triangle of the Problem Analysis Triangle below.

---

[133] Cockbain, E. (2018). Offender and Victim Networks in Human Trafficking. Abingdon. Routledge.

[134] de Vries I., Jose M.A., Farrell A. (2020) It's Your Business: The Role of the Private Sector in Human Trafficking. In: Winterdyk J., Jones J. (eds) The Palgrave International Handbook of Human Trafficking. Palgrave Macmillan, Cham

[135] Gerassi, L. B., Nichols, A. J., Cox, A., Goldberg, K. K., & Tang, C. (2021). Examining Commonly Reported Sex Trafficking Indicators From Practitioners' Perspectives: Findings From a Pilot Study. Journal of Interpersonal Violence, 36(11–12), NP6281–NP6303. https://doi.org/10.1177/0886260518812813

[136] Davy, D. (2016). Anti–Human Trafficking Interventions: How Do We Know if They Are Working? American Journal of Evaluation, 37(4), 486–504. https://doi.org/10.1177/1098214016630615

[137] Aronowitz, Alexis; Gerda Theuermann and Elena Tyurykanova (2010). Analysing the Business Model of Trafficking in Human Beings to Better Prevent the Crime. Office of the Special Representative and Coordinator for Combating Trafficking in Human Beings.

[138] Cockbain, E. (2018). Offender and Victim Networks in Human Trafficking. Abingdon. Routledge.

[139] Cohen, L. E., & Felson, M. (1979). Social Change and Crime Rate Trends: A Routine Activity Approach. American Sociological Review, 44(4), 588–608. https://doi.org/10.2307/2094589





While the inner triangle shows the necessary components that need to converge in time for a crime to occur, the outer triangle shows *Controllers.* Controllers can influence crime prevention. Controllers may have a direct impact on the crime, but more often have an indirect role in crime. There are three types of Controllers: Handlers, Guardians, and Place Managers. *Place Managers* (e.g. homeowner, property manager, etc.) control *Places*. *Handlers* (e.g. parents, probation officers, society, etc.) influence *Offenders*. *Guardians* (e.g. oneself, bystanders, neighbors, etc.) protect *Victims*. Most guardianship is self-guardianship, that is, people taking action to protect themselves.[140]

---

[140] Sampson, R., Eck, J. & Dunham, J. Super controllers and crime prevention: A routine activity explanation of crime prevention success and failure. Secur J 23, 37–51 (2010). https://doi.org/10.1057/sj.2009.17



## Human Trafficking Initiatives

Legislation, municipal ordinances, and industry responses to sex trafficking have evolved gradually. The timeline below highlights key recent milestones in addressing this issue.[141] [142] [143] [144] [145] [146] [147] [148]

### 1996

Industry Response: The founding of ECPAT International begins to bring global attention to child sex tourism, though the focus is primarily on destination travel rather than domestic hotel operations.

### 2000

Legislation: Victims of Trafficking and Violence Protection Act (TVPA) enacted, establishing human trafficking as a federal crime and introducing protections for victims.[149]

Industry Response: Minimal engagement from the hospitality sector at this stage; awareness was limited.

### 2003–2010

---

[141] Barrows, C. W., & Gasienica, A. (2023). Lodging employees' attitudes, knowledge, and training on human trafficking: A pilot study. Journal of Hospitality & Tourism Cases, 11(2).

[142] Jeng, C. C. (2022). Combating sex trafficking: The role of the hotel—Moral and ethical questions. Religions, 13(2), Article 138. https://doi.org/10.3390/rel13020138

[143] Kyriazi, T. (2023). The private sector against human trafficking in tourism. Anatolia: An International Journal of Tourism and Hospitality Research, 34(1), 30–44. https://doi.org/10.1080/13032917.2023.2129675

[144] Paraskevas, A., & Brookes, M. (2018). Human trafficking in hotels: An "invisible" threat for a vulnerable industry. International Journal of Contemporary Hospitality Management, 30(3), 1996–2014. https://doi.org/10.1108/IJCHM-03-2017-0154

[145] Paraskevas, A., & Brookes, M. (2018). Nodes, guardians and signs: Raising barriers to human trafficking in the tourism industry. Tourism Management, 67, 341–356. https://doi.org/10.1016/j.tourman.2018.01.017

[146] Sarkisian, G. (2015). Adopting the code: Human trafficking and the hospitality industry. The Sophie Fund. https://scholarlycommons.law.case.edu/jil/vol47/iss1/15

[147] Seymour, S. (2025). Reversing perverse incentives: A statutory approach to combatting sex trafficking in the hotel industry. Vanderbilt Law Review, 78(1).

[148] Teng-Vaughan, Y. (2024). Preventing modern slavery through corporate social responsibility disclosure: An analysis of the U.S. hospitality and tourism industry. Cornell Hospitality Quarterly, 65(2). https://doi.org/10.1177/19389655231182082

[149] Trafficking Victims Protection Act of 2000, Pub. L. No. 106-386.



Legislation: Reauthorizations of the TVPRA expand definitions and introduce additional tools for enforcement.[150] [151]

Industry Response: The American Hotel & Lodging Association (AHLA) begins preliminary discussions on the industry's role in trafficking prevention.

**2004**

Industry Response: The Code (The Tourism Child-Protection Code of Conduct) is introduced. It becomes the first major framework for hotels to commit to staff training and reporting.

**2011**

Industry Response: ECPAT-USA launches the Tourism Child-Protection Code of Conduct in partnership with the hospitality industry. Major hotel brands begin voluntarily adopting the Code.[152]

**2012**

Legislation: Executive Order 13627 requires federal contractors to take steps to prevent trafficking in supply chains.[153]

Industry Response: Hotel brands with federal contracts start developing internal anti-trafficking policies to ensure compliance.

**2014**

Industry Response: The American Hotel & Lodging Association (AHLA) begins developing more robust, industry-wide resources.

**2015**

Industry Response: Marriott International and other major hotel chains introduce formal human trafficking training for employees.[154]

**2018**

Legislation: Allow States and Victims to Fight Online Sex Trafficking Act (FOSTA-SESTA) enacted, targeting online platforms that facilitate trafficking.[155]

Industry Response: Increased legal attention motivates hotels to formalize staff protocols and collaborate with law enforcement. The AHLA Foundation launches "No Room for

---

[150] TVPA Reauthorization Acts (2003, 2005, 2008).

[151] https://www.justice.gov/humantrafficking/key-legislation

[152] ECPAT-USA. (2011). The Code of Conduct for the Protection of Children from Sexual Exploitation in Travel and Tourism.

[153] Exec. Order No. 13627, 77 Fed. Reg. 60029 (Oct. 2, 2012).

[154] Marriott International. (2015). Human Rights and the Protection of Children.

[155] Pub. L. No. 115-164.



Trafficking," a national campaign aimed at unifying anti-trafficking efforts across the entire U.S. lodging industry.

**2020**
Industry Response: AHLA launches the No Room for Trafficking initiative, committing to industry-wide training and awareness.[156]

**2022–Present**
Industry Response: Many hotel companies adopt mandatory annual trafficking training for all staff. Some expand partnerships with organizations like Polaris and ECPAT-USA.[157]

### *ESA Procedure*
ESA implemented a written Prostitution and Human Sex Trafficking Standard Operating Procedure (SOP) establishing a Zero Tolerance policy prohibiting prostitution and all forms of human sex trafficking at its properties. The SOP requires staff to immediately report suspected prostitution or trafficking activity to hotel management, and mandates that management investigate and escalate findings to the VP of Loss Prevention. The policy authorizes law enforcement notification when directed by senior leadership and requires documentation of all incidents through the company's Risk Management reporting system. Individuals suspected of involvement in prostitution or trafficking are to be removed from the property and placed into the electronic Property Management System "Do Not Rent" (DNR) file. Managers are instructed to maintain liaison relationships with local law enforcement and remain informed regarding trafficking trends in the area. The SOP identifies observable warning indicators of prostitution and trafficking, including day-to-day room extensions, frequent short-term visitors, lack of luggage, guests not in control of identification or funds, requests for remote rooms, and signs of fear, coercion, or abuse.[158]

### *ESA Training*
ESA produced training materials developed in conjunction with the American Hotel & Lodging Association (AHLA) instructing employees on the definition of sex and labor trafficking, recognition of indicators, and proper reporting protocols. The training directs employees to report suspected trafficking to management rather than confront suspects or independently contact law enforcement. The training emphasizes evaluating the totality

---

[156] American Hotel & Lodging Association. (2020). No Room for Trafficking.

[157] Hilton. (2022). ESG Report; IHG. (2023). Modern Slavery Statement.

[158] Prostitution and Human Sex Trafficking SOP (Bates RR-ESA001434–RR-ESA001436)



of circumstances before escalation and outlines department-specific warning signs for in-room staff, lobby staff, and security personnel.[159] ESA rolled out the training in 2015.[160]

As seen in the timeline above, ESA's human trafficking initiatives are consistent with the broader hospitality industry's evolving response to trafficking during the 2010–2015 timeframe. ESA's implementation of a formal Prostitution and Human Sex Trafficking SOP in July 2014, coupled with AHLA-based trafficking recognition training directing employees to identify indicators and escalate concerns through management channels, aligns temporally with these industry-wide developments. In this context, ESA's initiatives reflect participation in the mainstream hospitality industry shift from informal awareness toward structured anti-trafficking policy frameworks, reporting systems, and standardized employee training.

While the literature confirms hotels' vulnerability to trafficking due to guest anonymity and transience, and supports current interventions as logical responses; rigorous causal studies demonstrating measurable reductions in trafficking incidents following specific hotel interventions are lacking. The hospitality literature addresses training content, awareness, and organizational enablers, but does not yet provide causal evidence that training alone reduces trafficking incidents at properties. There are a handful of peer-reviewed hospitality studies that *address* training (usually as a recommended or measured factor), but none that show causal, hotel-level trafficking incident reduction from training.[161] [162] [163] [164] My research has found no peer-reviewed, hotel-specific evaluations of trafficking training for security officers. A review of the existing literature reveals no evidence-based support for the effectiveness of the human trafficking training currently promoted by the Blue Campaign, Polaris, ECPAT International, the American Hotel and Lodging Association (AHLA), or similar organizations.[165] Notably, a 2022 study

---

[159] AHLA Human Trafficking Training Module (Bates RR-ESA001434–RR-ESA001471)

[160] Conlon Interview, 2/12/26

[161] Zhang, J., Ronzoni, E., Medeiros, D., & Bufquin, D. (2022). A qualitative assessment of hotel employee engagement in anti-human-trafficking initiatives. International Journal of Hospitality Management, 102, 103177. https://doi.org/10.1016/j.ijhm.2022.103177

[162] Farboudi-Jahromi, M., Tasci, A. D. A., & Sönmez, S. (2023). Employees' helping behavior toward the victims of human trafficking in the lodging industry. International Journal of Contemporary Hospitality Management, 35(3), 1-30. https://doi.org/10.1108/IJCHM-04-2022-0454

[163] Gąsienica, M. (2022). Lodging employees' attitudes, knowledge, and training on human trafficking. Journal of Hospitality & Tourism Insights, 0(0), 0-0. https://doi.org/10.1080/15332845.2022.2106615

[164] Wu, A., Wei, W., & Zhang, L. (2025). From bystanders to up-standers: A multi-level strategy to combat human trafficking in hospitality. ICHRIE Research Reports, 10(3), Article 5. https://doi.org/10.61701/812917.869

[165] Quincy C. Miller, Kristina Todorovic, Christina O. Perez, Amy L. Capparelli & Kamala London (2021) Laypeople's Knowledge and Misconceptions of Sex Trafficking Influenced by Training Formats, Journal of Human Trafficking, DOI: 10.1080/23322705.2020.1865767



found that laypeople have a very low rate of recognizing human trafficking, even when informed that sexual activity occurred between an adult and a minor. In the study, participants were presented with a vignette describing an adult man found with a minor in a hotel room—a scenario that strongly implied, but did not explicitly state, trafficking. Although participants were clearly told that the adult and minor had engaged in sexual intercourse, only 61% recognized the situation as a crime. Among those, 21% identified the offense as prostitution, and just 5% identified it as trafficking.[166]

## Security Policies

### Guest Policies

ESA requires all guests to present valid government-issued photo identification at check-in, and staff must verify that the identification matches the registration information. Additional room keys may be issued only to registered occupants in order to maintain access control.[167] [168] As is common practice in similar lodging facilities, ESA did not implement a dress code for guests.[169]

The Do Not Disturb (DND) Room Training Documentation provides that management may enter a guest room after an extended DND status or when safety, welfare, operational necessity, or suspected criminal activity warrants entry, and requires that such entries be documented in the Front Desk Log.[170] If weapons, suspicious items, or evidence of criminal conduct are observed during entry, staff are instructed to notify management and contact law enforcement as appropriate [171] Housekeepers are trained to report unusual or suspicious items in a guest room.[172]

### Incident Reporting and Do Not Rent Practices

ESA maintains formal incident reporting procedures requiring documentation of theft, assault, robbery, medical emergencies, and other significant events, with retention governed by company policy.[173] The Do Not Rent (DNR) procedures prohibit rental to individuals previously associated with disturbances, criminal conduct, or nonpayment. Guest reservations, payment records, incident data, and the DNR are maintained in the

---

[166] Kaitlin M. H. Winks, Georgia M. Lundon, Hayden M. Henderson & Jodi A. Quas (2022) Laypersons' recognition of and attribution of blame in situations involving domestic minor sex trafficking, Psychology, Crime & Law, DOI: 10.1080/1068316X.2022.2139377

[167] ESA Policies and SOPs (RR-ESA000300 through RR-ESA001472)

[168] Conlon Interview, 2/12/26

[169] Conlon Interview, 2/12/26

[170] ESA Policies and SOPs (RR-ESA000300 through RR-ESA001472)

[171] ESA Policies and SOPs (RR-ESA000300 through RR-ESA001472)

[172] Conlon Interview, 2/12/26

[173] ESA Policies and SOPs (RR-ESA000300 through RR-ESA001472)



Property Management System (PMS).[174]  Both ESA Site 1510 or Site 9638 maintained a DNR list.[175]

**Physical Security**
Physical security measures at ESA properties include exterior lighting, functioning exterior doors, and removal of abandoned or unregistered vehicles. The Video Surveillance Retention Policy provides that surveillance footage is retained for a defined period and overwritten unless preserved for investigative or legal purposes.[176]

**Security Personnel**
ESA documents reflect the use of security personnel at both Site 1510 and Site 9638 during 2015.  Site 1510 had a budget of $45,854 during 2015; while Site 9638 had a budget of $14,599.[177]  The security line item in the budget was used solely for security personnel.[178] A separate ESA document reflects security personnel provided by US Security Associates at Site 9638 during 2009 to 2015.[179]

---

[174] ESA Policies and SOPs (RR-ESA000300 through RR-ESA001472)

[175] Conlon Interview, 2/12/26

[176] ESA Policies and SOPs (RR-ESA000300 through RR-ESA001472)

[177] 2015 Budget P&L ESA Site 1510 and Site 9638

[178] Conlon Interview, 2/12/26

[179] 2009-2015 ESA Site 9638 Security Invoices and Payments



**OPINIONS**

My opinions relate to the risk of crime developed from evidence-based research and experience consulting with and for properties across the country. As a security consultant and crime analyst, I have spent over 30 years developing specialized knowledge regarding security and crime prevention. During that time, I have reviewed security guidelines, standards, best practices, and criminological research which informs my opinions and assists in my evaluation of crime risk at places similar to ESA Site 1510 and Site 9638.

Using this specialized knowledge, I have written three books and numerous articles on crime analysis, security, and crime prevention and presented on these topics at industry conferences. I have also developed, in collaboration with other experts, security and crime prevention standards, guidelines, and best practices for three major security industry associations. I have chaired committees for security industry associations which developed evidence-based research regarding the efficacy of security measures in prevention violent, property, and disorder crime.  Please see my Curriculum Vitae (Appendix A) for specific details.

In arriving at my opinions in this case, I adhered to the consensus-based, published, and peer-reviewed *Forensic Methodology* (Appendix B) promulgated by the International Association of Professional Security Consultants (IAPSC).

For all the reasons set forth throughout this report, my opinions with respect to this matter are as follows:

1.  With respect to crime risk, my opinion will be supplemented upon receipt of the requested crime records from Broward County Sheriff's Office and the Fort Lauderdale Police Department for ESA Site 1510 and Site 9638.

2.  ESA's human trafficking policies and training were implemented in alignment with the broader hospitality industry's response during the 2010–2015 period. Specifically, ESA's July 2014 Prostitution and Human Sex Trafficking SOP and its adoption of AHLA-based recognition training in 2015 were consistent with the industry-wide shift at that time toward formalized anti-trafficking policies, structured reporting protocols, and standardized employee training programs.

3.  ESA Site 1510 and Site 9638 had a reasonable security program, consisting of a multi-pronged approach to mitigating crime risk, including risks associated with sex trafficking.  The defendants met the applicable standard of care relating to security.

**--- End of Report ---**



**I reserve the right to update or supplement this report as additional discovery becomes available and further case activities are completed.**

Respectfully submitted,

Karim H. Vellani, CPP, CSC



## PUBLICATIONS

Vellani, K. (2026).  Strategic Security Management:  A Risk Assessment Guide for Decision Makers, Third Edition.  Boca Raton, FL: Taylor & Francis CRC Press.

Perez, K. L., Kaufer, S., Silva, M. A., Vellani, K., & Zajic, A. W. (2025). Place Management for Apartment Crime Prevention (EBSP-25-02). Evidence-Based Security Practices, International Association of Professional Security Consultants.

Vellani, K. (2025).  "Forensic Methodology – The Gold Standard for Expert Witnesses" (Panelist). Annual Conference, International Association of Professional Security Consultants, San Diego, CA, May 1, 2025.

Vellani, K. Kaufer, S.; & Army, C. (2024). A Refined Violent Crime Typology: Analyzing and Solving Specific Types of Violence. ASU Center for Problem-Oriented Policing.

Vellani, K. (2023).   "Transitioning to Evidence-Based Security Practices." ASIS - International.  Houston, TX, November 8, 2023.

Vellani, K. (2023).  "Using Evidence-Based Research to Understand and Prevent Crime." Evidence-Based Security Practices Committee, International Association of Professional Security Consultants, January 24, 2023.

Army, Christine, & Vellani, Karim H. (2023). Risky Behaviors and Violent Victimization (EBSP-23-01). Evidence-Based Security Practices, International Association of Professional Security Consultants.

Vellani, Karim H., & Kristof, Tina S. (2022). "Security's Critical Role In Combating Sex Trafficking." Journal of Healthcare Protection Management, Volume 76, Number 1, International Association for Healthcare Security & Safety.

Vellani, Karim H. (2021).  Unraveled: An Evidence-Based Approach to Understanding and Preventing Crime. Sugar Land, TX: Threat Analysis Group, LLC.

Vellani, Karim H. (2021).  "Mitigating Security Risks with Evidence-Based Research." Hospital Association of Southern California, November 3, 2021.

Army, Christine, & Vellani, Karim H. (2021). Violent Crime Typology and Continuum. CrimRxiv. https://doi.org/10.21428/cb6ab371.71ec923d

Vellani, Karim H., & Kristof, Tina S. (2021). Identifying and Responding to Sex Trafficking Victims in Healthcare Environments. CrimRxiv. https://doi.org/10.21428/cb6ab371.84ddfc71



Vellani, Karim H. and Tina S. Kristof (2021). "Results of the 2020 Healthcare Crime Survey." Journal of Healthcare Protection Management, Volume 36, Number 1, International Association for Healthcare Security & Safety.

Vellani, Karim H.; Bryan Warren; Jeff Young (2020). "The Impact of COVID-19 on Healthcare Facilities." International Association of Healthcare Security and Safety, October 28, 2020.

Pompeii, Lisa, Elisa Benavides, Oana Pop, Yuliana Rojas, Robert Emery, George Delclos, Christine Markham, Abiodun Oluyomi, Karim Vellani, Ned Levine (2020). Workplace Violence in Outpatient Physician Clinics: A Systematic Review. International Journal of Environmental Research and Public Health, 17, 6587.

Vellani, Karim H. (2020). "Impressing Your Boss: Using the IAHSS Foundation's Crime Survey and Other Foundation Research to Improve Your Program." International Association of Healthcare Security and Safety, Virtual Conference, September 1, 2020.

Vellani, Karim H. (2020). "2020 Healthcare Crime Survey." International Healthcare Security and Safety Foundation.

Vellani, Karim H. (2019). Strategic Security Management: A Risk Assessment Guide for Decision Makers, Second Edition. Boca Raton, FL: Taylor & Francis CRC Press.

Vellani, Karim H. (2019). "Evidence, Anecdotes, and Actions: A Summary of the 2019 Healthcare Crime Survey and other IAHSS Foundation Research." Journal of Healthcare Protection Management, Volume 35, Number 2, International Association for Healthcare Security & Safety.

Vellani, Karim H. (2019). "2019 Healthcare Crime Survey." International Association of Healthcare Security and Safety, Orlando, FL, May 21, 2019.

Vellani, Karim H. (2019). "How Many Security Officers Do You Need? An Evidence-based Approach to Determining the Industry Average Number of Hospital Security Officers." International Association of Healthcare Security and Safety, Orlando, FL, May 20, 2019.

Vellani, Karim H., Michael S. D'Angelo and Ken Wheatley (2019). "Vetting Clients: From First Call Through Final Report." 35th Annual Conference, Miami, FL, International Association of Professional Security Consultants, May 5, 2019.

Vellani, Karim H. (2019). "2019 Healthcare Crime Survey." International Healthcare Security and Safety Foundation.



Vellani, Karim H., Robert J. Emery, Sadie H. Conway, and Lisa A. Pompeii (2019). "A Refined Model for Estimating the Industry-Average Number of Security Staff for Hospitals." Journal of Healthcare Protection Management, Volume 35, Number 1, International Association for Healthcare Security & Safety.

Vellani, Karim H. (2018). "Threat Assessment in the Private Sector: Application of the IAPSC Forensic Methodology Threat Assessment Section Outside of Litigation." 34th Annual Conference, San Diego, California, International Association of Professional Security Consultants, April 30, 2018.

Vellani, Karim H. (2017). "Violence Against Healthcare Workers: Persistent Trends and Appropriate Responses." Journal of Healthcare Protection Management, Volume 32, Number 2, International Association for Healthcare Security & Safety.

Vellani, Karim H. (2017). "2017 Healthcare Crime Survey." International Healthcare Security and Safety Foundation.

Vellani, Karim H. (2016). "The Battle against Violence in U.S. Hospitals." Journal of Healthcare Protection Management, Volume 32, Number 2, International Association for Healthcare Security & Safety.

Vellani, Karim H. (2016). "2016 Healthcare Crime Survey." International Healthcare Security and Safety Foundation.

Vellani, Karim H. (2015). "Arming Security Officers" (Panelist). International Association of Healthcare Security and Safety, Houston, Texas, November 13, 2015.

Vellani, Karim H. (2015). "Statistics as a Security Management Tool" in Charles A. Sennewald's Effective Security Management, 6th Edition. Woburn: Elsevier.

Vellani, Karim H. (2015). "Workplace Violence." Greater Houston Industrial Hygiene Council, Houston, TX, June 18, 2015.

Vellani, Karim H. (2015). "Security Risk Assessments." Greater Houston Industrial Hygiene Council, Houston, TX, June 18, 2015.

Vellani, Karim H. (2015). "2015 Healthcare Crime Survey." International Association of Healthcare Security and Safety, St. Louis, MO, May 5, 2015.

Vellani, Karim H. (2015). "2015 Healthcare Crime Survey." International Healthcare Security and Safety Foundation.

Vellani, Karim H., Robert J. Emery, and Jennifer M. Reingle Gonzalez (2015). "A Data-Driven Model for Estimating Industry Average Numbers of Hospital Security Staff."



Journal of Healthcare Protection Management, Volume 31, Number 1, International Association for Healthcare Security & Safety.

Vellani, Karim H. (2015).   Foreword to Michael S. D'Angelo's From Police to Security Professional: A Guide to a Successful Career Transition.  Boca Raton:  CRC Press.

Vellani, Karim H. (2014).   "Reducing Violence in Healthcare Facilities."   International Association of Healthcare Security and Safety, Houston, Texas, July 19, 2014.

Vellani, Karim H. (2014).  "2014 Healthcare Crime Survey."  International Association of Healthcare Security and Safety, San Diego, CA, May 20, 2014.

Vellani, Karim H. (2014).  "2014 Healthcare Crime Survey."  International Healthcare Security and Safety Foundation.

Vellani, Karim H. (2014).   "Reducing Violence in Healthcare Facilities."   Journal of Healthcare Protection Management, Volume 30, Number 1, International Association for Healthcare Security & Safety.

Vellani, Karim H. (2013).   "The Business Plan and Successful Security Partnering" Successful Security Consulting Seminar, International Association of Professional Security Consultants and ASIS - International.  Chicago, IL, September 23, 2013.

Vellani, Karim H. (2012).  "The Need for Effective Consulting Websites" in Charles A. Sennewald's Security Consulting, 4th Edition.  Woburn:  Elsevier.

Vellani, Karim H. (2012).   "Security Staffing:   Madness to Methods to Outcomes." International Association of Healthcare Security and Safety, Houston, Texas, October 12, 2012.

Vellani, Karim H., Norman Bates, and Steve Kaufer (2012).  "Security 2012 – The Latest Trends in Crime Analysis, Security Technology and Management Practices for Inadequate Security Litigators." National Crime Victim Bar Association, New Orleans, LA, September 21, 2012.

Vellani, Karim H., Robert J. Emery, and Nathan Parker (2012).  "Staffing Benchmarks: How Many Security Officers are Enough?"   Journal of Healthcare Protection Management, Volume 28, Number 2, International Association for Healthcare Security & Safety.

Vellani, Karim H. (2011).  "Using Crime Analysis to Solve Problems in 15 Small Steps." Journal of Healthcare Protection Management, Volume 27, Number 2, International Association for Healthcare Security & Safety.



Vellani, Karim H. (2011).  "Crime Analysis:  A Framework for Optimizing Security." International Association of Healthcare Security and Safety, Toronto, Ontario, May 24, 2011.

Vellani, Karim H. (2011).  "Statistics as a Security Management Tool" in Charles A. Sennewald's Effective Security Management, 5th Edition.  Woburn:  Butterworth-Heinemann.

Vellani, Karim H. with Brian Gouin (2010).  "Security Risk Assessments in the Environment of Care."  American Society of Healthcare Risk Management, Tampa, FL, October 15, 2010.

Vellani, Karim H. (2010).  "The Business Plan and Successful Security Partnering" Successful Security Consulting Seminar, International Association of Professional Security Consultants and ASIS - International.  Dallas, TX, October 11, 2010.

Vellani, Karim H. (2010). "Security Risk Assessments."  Texas Regional Conference, The Woodlands, Texas, International Association of Professional Security Consultants, September 15, 2010.

Vellani, Karim H. (2010) "Crime Analysis for Problem Solving Security Professionals in 25 Small Steps."  Karim H. Vellani.  [Center for Problem Oriented Policing www.popcenter.org].

Vellani, Karim H. (2010).  "Crime Analysis:  Assessing Threats to Optimize Security." Threat Analysis Group, LLC.  Available via Amazon.com.

Vellani, Karim H. (2010). "Crime Analysis:  Optimizing Security in Healthcare Facilities." International Association of Healthcare Security and Safety, Houston, Texas, May 21, 2010.

Vellani, Karim H. (2010).  "Crime Analysis:  A Framework for Optimizing Security and Assessing Foreseeability."  26th Annual Conference, Savannah, Georgia, International Association of Professional Security Consultants, April 26, 2010.

Vellani, Karim H. (2009).  "Security Risk Assessments."  Security 101 for Health and Safety Professionals, Southwest Center for Occupational & Environmental Health, School of Public Health, University of Texas, October 29, 2009.

Vellani, Karim H. (2009).  "The Business Plan and Successful Security Partnering" Successful Security Consulting Seminar, International Association of Professional Security Consultants and ASIS - International.  Anaheim, CA, September 20, 2009; Dallas, TX, October 11, 2010; Orlando, FL, September 18, 2011.



Vellani, Karim H. (2009).  "Security Risk Assessments."  Healthcare Security: Basic Industry Guidelines, January 2009, International Association for Healthcare Security & Safety.

Vellani, Karim H. (2008).  "Data Driven Security."  Security Solutions Series, Threat Analysis Group, LLC.

Vellani, Karim H. (2008).  "Risk Assessments in the Environment of Care."  Wisconsin Healthcare Engineering Association, October 29, 2008.

Vellani, Karim H. (2008).  "The Uniform Crime Reporting System" in Charles A. Sennewald and John H. Christman's Retail Crime, Security, and Loss Prevention:  An Encyclopedic Reference.  Woburn:  Butterworth-Heinemann.

Vellani, Karim H. (2008).  "Threat Assessment in the Retail Environment" in Charles A. Sennewald and John H. Christman's Retail Crime, Security, and Loss Prevention:  An Encyclopedic Reference.  Woburn:  Butterworth-Heinemann.

Vellani, Karim H. (2007).  "Security Risk Assessments."  Security 101 for Health and Safety Professionals, Southwest Center for Occupational & Environmental Health, School of Public Health, University of Texas, November 14, 2007.

Vellani, Karim H. and Robert E. Owles (2007).  "Vulnerability and Risk Assessments in the Environment of Care."  Journal of Healthcare Protection Management, Volume 24, Number 1, International Association for Healthcare Security & Safety.

Vellani, Karim H. (2007).  Foreword to Brian Gouin's Physical Security Consulting. Woburn:  Butterworth-Heinemann.

Vellani, Karim H. (2007).  "The Gentle Art of Threat Assessment."  Journal of Healthcare Protection Management, Volume 23, Number 1, International Association for Healthcare Security & Safety.

Vellani, Karim H. (2006).  "Crime Analysis" in John J. Fay's Encyclopedia of Security Management:  Techniques and Technology, 2nd Edition.  Woburn:  Butterworth-Heinemann.

Vellani, Karim H. (2006).  "Security Risk Assessments in the Environment of Care." International Association of Healthcare Security and Safety, Houston, Texas, May 21, 2010.

Vellani, Karim H. (2006).  Strategic Security Management:  A Risk Assessment Guide for Decision Makers.  Woburn:  Butterworth-Heinemann.



Vellani, Karim H. (2006).  "Strategic Security Management:  Risk Assessments in the Environment of Care."  Journal of Healthcare Protection Management, Volume 22, Number 2, International Association for Healthcare Security & Safety.

Vellani, Karim H. (2005).  "Certified Security Consultant." Successful Security Consulting Seminar, International Association of Professional Security Consultants.  Orlando, FL, September 10, 2005.

Vellani, Karim H. (2005).  "Crime and Foreseeability Analysis." The Sentry.  American Society for Industrial Security - International: Houston Chapter.  June, 2005.

Vellani, Karim H. (2004).  "Crime and Foreseeability Analysis." The Independent Security Consultant.  International Association of Professional Security Consultants.  Fall, 2004.

Vellani, Karim H. and Charles A. Sennewald (2004).  Consultants as a Protection Resource, Protection of Assets Manual.  Alexandria: ASIS International.

Vellani, Karim H. (2004).  "The Business Plan." Successful Security Consulting Seminar, International Association of Professional Security Consultants.  Dallas, TX, September 25, 2004; Carefree, AZ, May 7, 2006; San Diego, CA, September 24, 2006.

Vellani, Karim H. (2004).  "Writing Effective Proposals" International Association of Professional Security Consultants.  Newport Beach, CA, April 27, 2004.

Vellani, Karim H. (2004).  "Boosting Performance and Morale."  Security Business Practices Reference, Volume 6, ASIS Council on Business Practices, ASIS International.

Vellani, Karim H. (2004).  "Achieving Return on Investment from Crime Analysis." Security Business Practices Reference, Volume 6, ASIS Council on Business Practices, ASIS International.

Vellani, Karim H. (2003).  "Security Solutions for Strip Shopping Centers."  Security Solutions Series, Threat Analysis Group, LLC, 2003.

Vellani, Karim H. (2003).  "Security Solutions for Grocery Stores."  Security Solutions Series, Threat Analysis Group, LLC, 2003.

Vellani, Karim H. and Mark Batterson (2003). "Security Solutions for Banks."  Security Solutions Series, Threat Analysis Group, LLC, 2003.

Vellani, Karim H. (2003).  "Statistics as a Security Management Tool" in Charles A. Sennewald's Effective Security Management, 4th Edition.  Woburn:  Butterworth-Heinemann.



Vellani, Karim H. (2002).  "Crime Analysis:  The First Step in Creating an Effective Crime Prevention Program."  Security Business Practices Reference, Volume 5, ASIS Council on Business Practices, ASIS International.

Vellani, Karim H. (2002).  "Crime Analysis in the Medical Environment." Workplace Safety Seminar, School of Public Health, University of Texas Health Science Center, December 2, 2002.

Vellani, Karim H. (2002).  "Risk Analysis" University of Houston - Downtown.  CJ 5360: Security and Crisis Management: Theories and Practices, April 8, 2002.

Vellani, Karim H. (2002).  "Crime Analysis Literature: What We Have and Where We Are Going."  Forecaster, International Association of Crime Analysts, Spring 2002.

Vellani, Karim H. (2001).  "Rape Zones: Are Some Neighborhoods More Prone To Sexual Assault?"  KHOU 11, Houston, Texas.  Aired November 25, 2001.

Vellani, Karim H. (2001).  "Crime Analysis: The First Step in Creating an Effective Crime Prevention Program."  47th Annual Seminar & Exhibit, San Antonio, Texas, American Society for Industrial Security, October 1, 2001.

Vellani, Karim H. (2001).  "Don't Let Your Guard Down." Security Management, American Society for Industrial Security, October 2001.  Edited extensively by Security Management editors.

Vellani, Karim H. (March 29, 2000).  "Convenience Store Security." Presented to Pakistan Association of Greater Houston (PPLAINTIFFH).

Vellani, Karim H. and Joel D. Nahoun (2001).  Applied Crime Analysis.  Woburn: Butterworth-Heinemann.

Vellani, Karim H. (2000).  "Security + Service = Satisfaction: The Perks of Private Security."  Journal of Property Management, Institute of Real Estate Management, May/June 2000.

Vellani, Karim H. (1999).  "Crime Stoppers."  Journal of Property Management, Institute of Real Estate Management, September/October 1999.

Vellani, Karim H. (1998).  "Management Ideas for Preventing Crime:  An Analysis of Liability, Site-Specific Crime Prevention, Crime Prevention Through Environmental Design, and Violence Escalation."  Sam Houston State University, Huntsville, Texas.



## TESTIMONIAL HISTORY

I testified by deposition or in trial in the following matters during the past four years:

Civil Action File No. SU20CV0185; Lashanda Callaway, Plaintiff and Justyn Aikens, Plaintiff vs. Clarke Gardens Apartments; Ashton Clarke, LP; Ambling Management Co. LLC; and John Doe Defendants A through H, Defendants; In the Superior Court of Clarke County, State of Georgia
March 29, 2022

Cause No. CC-19-03831-D; Jessica Hill as Next Friend of HVH, SMH, JRH, and KPH, Minor Children, Priscilla Escobedo-Hill, Individually, and as Next Friend of KMH, a Minor and Romeo Hill, Individually, Plaintiffs vs. RCI Hospitality Holdings, Inc., d/b/a XTC Dallas Cabaret, Front-Line Protective Services, Eric Hansen, And Daterrious Haggard, Defendants; In the County Court at Law No. 4 of Dallas County, Texas
March 31, 2022

No. 2017 L 11405; Karin Carlson and Grant Maddox, Plaintiffs vs. Going Places, LLC; Dearborn Street Building Associates, LLC; PBBS, INC.; PMD Realty, LLC; PMD Builds, LLC, and Astor Street Partners, LLC, Defendants; In the Circuit Court of Cook County, Illinois, County Department - Law Division (Trial Testimony)
April 6, 2022

Civil Action File No. 2020RCCV00531; Aubrey Adams-Knowlden, Plaintiff vs. August Mall, LLC; Amy Dalton; Andy Frain Services, Inc. and John Does 1-20, Defendant(s); In the Superior Court of Richmond County, State of Georgia
June 9, 2022

Case No. 2021-007809-CA-01; Ronald Walker, as Personal Representative of the Estate of Devan Walker, deceased, Plaintiff vs. Pink Pressure, Inc. and Marlin Road Partners, LLC, Defendants; In the Circuit Court of the Eleventh Judicial Circuit, in and for Miami-Dade County, Florida, Circuit Court Civil Division
June 29, 2022

Cause No. 2019-43473; Christopher Esquivel and Maria Maya, Individually and as Representatives of the Estate of Ramon Esquivel (Deceased), Plaintiffs vs. KVA Investments, LLC d/b/a Bristol Court Apartments, and Falcon Security, Inc., Defendants; In the 269th District Court, Judicial District Court, Harris County, Texas
July 15, 2022

Case No. 2021-00-3836-CA-01; Barbara Smith, as Personal Representative of the Estate of Gregory Smith, Jr., Plaintiff vs. Providence 72 LLC, the Lopez Companies, Inc., & John Doe, Defendants; In the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida, Civil Division



August 29, 2022

Cause No. 2019-04407; Juan Ramos Cantu vs. Village Real Property, Inc.; In the District Court of Harris County, Texas; 80th Judicial District
September 30, 2022

Civil Action No. STCV19-01893; Tonya Sills, Plaintiff vs. New Millennium Smiles, LLC d/b/a Savannah Smiles Dueling Pianos, Defendant; In the State Court of Chatham County, State of Georgia
November 14, 2022

Case No. 21-018455; Shanika Williams, Plaintiff vs. Venice Partners, LTD., a Florida Corporation, Southport Financial Services, Inc., a Foreign Corporation, and Cambridge Management of Washington, Inc. a Foreign Corporation, Defendants; In the Circuit Court of the Seventeenth Judicial Circuit, in and for Broward County, Florida
November 16, 2022

Caroline Bradley, Plaintiff vs. Golden Pantry Food Stores, Inc., Eric Mitchell, and John Does 1 and 2, Defendants; In the State Court of Clarke County, State of Georgia
December 1, 2022

Case No. A-20-812202-C, Dept. No. IV; Glenn Bension, Administrator of the Estate of Jamie Arnold, Deceased; and Shirley Arnold, and Heir to the Estate of Jamie Arnold, Deceased, Plaintiffs vs. Alhambra Place Partnership, LP, Advanced Management Group Nevada, LLC, Reliance Security, Inc., Defendants; In the District Court, Clark County, Nevada
December 5, 2022

Cause No. 2021-23853; Ricci Simmons, Jr., Plaintiff vs. Crysnick Entertainment, LLC d/b/a Bar 2200, Boniuk Interests, Ltd., Mila Properties, Inc., Crystal D. Henderson, and G4S Secure Solutions (USA), Inc., Defendants; In the District Court, Harris County, Texas, 281st Judicial District
December 14, 2022

Cause No. 2021-37331; Reta L. Hutchins, Individually and as Estate Representative for Decedent, Marquise Hutchins, and Traivion Moore, Plaintiffs vs. 7-Eleven Inc., ANR Corporation, Defendants; In the District Court, Harris County, Texas, 11th Judicial District
March 2, 2023

Civil Action File No. 2022V-0023SFW; Tamekia Arnold, as Legal Guardian and Next Friend of Kentavious Gordon; and Tamekia Arnold, as the Administrator of the Estate of Louis Tramaine Gordon, Deceased, Plaintiffs vs. Falguni Patel, Defendant; In the Superior Court of Bleckley County, State of Georgia
March 24, 2023



Cause No. D-1-GN-20-000667; Roel Zamora, Plaintiff vs. TP Franchise Austin, LLC; TP Franchise Venture I, LP; TP Franchise Venture I, LLC; TP Texas Beverages, LLC; Twin Restaurant Management, LLC; Front Burner Restaurants GP, LLC; and Front Burner Restaurants, LP, Defendants; In the District Court, 419th Judicial District, Travis County, Texas
April 14, 2023

No. 2022CV363118; Graham vs. VCP Hammond, LLC; In the State Court of Fulton County, Georgia
April 20, 2023

Civil Action File No. 2021RCCV00575; Traci Boykin and Halma Boykin as surviving children of David Boykin, for themselves and Chrissy Ann Boykin, as administrator of the Estate of David Boykin, deceased, Plaintiffs vs. Brookside Properties, Inc. (Tennessee), d/b/a Peach Orchard Plaza, a foreign profit corporation, G4S Secure Solutions (USA) Inc., a foreign profit corporation, and Biotest Pharmaceuticals Corporation, a foreign profit corporation, Defendants; In the Superior Court of Richmond County, State of Georgia
May 11, 2023

Carolyn Enzor, as Next friend of Kai Enzor and Karter Enzor and Julianne Glisson, Administrator of The Estate of Ka'la Enzor v. The Kroger Co.; In the United States District Court, Southern District of Georgia, Savannah Division, Civil Action No. CV422-083
June 14, 2023

Case No. A-19-799464-C, Dept. No. III; Gloria S. Zapata, as special administrator for the estate of Jonathan Blackstone, deceased; and Mitchell Blackstone, individually and as heir to the Estate of Jonathan Blackstone, Plaintiffs vs. Showcase 1415 LLC et al, Defendants; In the District Court, Clark County, Nevada
June 16, 2023

Case No. 2020-CA-8908; Walter Nelson, Plaintiff vs. S2 Grandview, LLC and S2C Florida Management, LLC, Defendants; In the Circuit Court of the 9th Judicial Circuit, In and For Orange County, Florida
August 14, 2023

Civil Action File No. 22EV002045; Jihad Karim, Plaintiff vs. Integral Property Management, LLC, Defendant; In the State Court of Fulton County, State of Georgia
August 17, 2023

Case No. 01-22-0002-8503; Virginia Smotherman, Individually and on behalf of the Estate of Pollyanna Smotherman vs. GPM Southeast, LLC and GPM Investments, LLC d/b/a E-Z Mart, and John Doe; In the American Arbitration Association
August 29, 2023



Cause No. 21-CVS-2396; Dorinda Holaday, as Ancillary Administrator of the Estate of John Holaday, Plaintiffs vs. Epicentre SPE (Charlotte), LLC, Epicentre (Charlotte), LLC, CIM Group, LP, CIM Management, Inc., CIM Group, LLC, Raheem Sachlette, and Universal Protection Service, LLC d/b/a Allied Security and/or Allied Universal, Defendants; In the General Court of Justice, Superior Court Division
September 25, 2023

Case No: 1:22-CV-01108; Wallace Wormack, et al, Plaintiffs v. Caesars Baltimore Management Company, LLC, et al, Defendants; In the United States District Court for the District of Maryland, Northern Division
September 26, 2023

Civil Action File No. 20-C-04895-S2; Shanique Mayes, Individually and as Next of Kin and Natural Parent on behalf of McKenzie Mayes, a minor, Plaintiffs vs. Eastwyck Village Apartments, and Countour Eastwyck, Defendants; In the State Court of Gwinnett County, State of Georgia
October 11, 2023

Cause No. CV2045855; Bulah Marie Garrett, Individually and as Representative of the Estate of Lyndell Ray Garrett, Deceased, Lisa Garrett and Shelly Garrett, Plaintiffs vs. Wal-Mart Stores Texas, LLC d/b/a Wal-Mart Supercenter #561 and Greyhound Lines, Inc., Defendants; In the District Court, 91st Judicial District, Eastland County, Texas
November 2, 2023

Civil Action File No. 1:20-cv-05233-SEG; J.G., Plaintiff vs. Northbrook Industries, Inc., d/b/a United Inn and Suites, Defendant; In the United States District Court for the Northern District of Georgia, Atlanta Division; Civil Action File No. 1:20-CV-05231-JPB; A.G., Plaintiff vs. Northbrook Industries, Inc., d/b/a United Inn and Suites, Defendant; In the United States District Court for the Northern District of Georgia, Atlanta Division; Civil Action File No. 1:20-CV-05232-JPB; G.W., Plaintiff vs. Northbrook Industries, Inc., d/b/a United Inn and Suites, Defendant; In the United States District Court for the Northern District of Georgia, Atlanta Division
November 28, 2023

Case No. 2016-CV00782, Division 17; Darrell Sander, Plaintiff v. Landmark Realty of Missouri, LLC, dba Landmark Realty, LLC, and KC Waldo Heights Apts., LLC; In the Circuit Cout of Jackson County, Missouri at Independence
December 1, 2023

Civil Action File No. 22EV001790; Tammia Verser, Plaintiff vs. AG-P Atlanta Perimeter Owner, LLC, d/b/a Hyatt Regency Atlanta Perimeter at Villa Christina, Defendant; In the State Court of Fulton County, State of Georgia
December 7, 2023



Civil Action File No. 21-CG-0506-DG; Reginald Bloodsaw, Plaintiff vs. Envolve Community Management, LLC f/k/a LEDIC Realty Company, LLC A Foreign Limited Liability Corporation, Oconee Park Partners, LP, a Georgia Limited Partnership and John Does Nos. 1-5, Defendants; In the Superior Court of Laurens County, State of Georgia
December 12, 2023

Civil Action File No. 2020CV341987; Katherine Wenszell, and Susan Wenszell, Plaintiffs vs. Metropolitan Atlanta Rapid Transit Authority, Defendants; In the Superior Court of Fulton County, State of Georgia
December 19, 2023

Civil Action No. 20-A-301; Dawn C. Smith and Brad S. Smith, Plaintiffs vs. Six Flags Over Georgia, LLC, Six Flags Over Georgia, LTD (L.P.), Six Flags Over Georgia II, LP, Six Flags Over Georgia, Inc., Six Flags Fund, LTD, LP, SFOG II, Inc., SFG-I, LLC, SFG-II, LLC, and John Does Nos. 1-5, Defendants; In the State Court of Cobb County, State of Georgia (Deposition January 6, 2022 and Rebuttal Deposition December 21, 2023)
January 6, 2022

Case No. 2021-027908-CA-01; Hung Nguyen, as Personal Representative of the Estate of Le'Shonte Jones, deceased, Plaintiff vs. Coral Bay Cove, LLC, a Florida limited liability company, and Royal American Management, Inc., a Florida corporation, Defendants; In the Circuit Court of the 11th Judicial Circuit in and for Miami-Dade County, Florida
January 11, 2024

Case No. 2021-010717-CA-01; Allisha Johnson, as Personal Representative of the Estate of Solomon Johnson, Plaintiff vs. Miami-Dade County, and Security Alliance, LLC, Defendants; In the Circuit Court of the 11th Judicial Circuit, in and for Miami-Dade County, Florida
January 29, 2023

No. 1:23-cv-00145-JPB; AG and HH vs. Dayram V. Patel; In the United States District Court for the Northern District of Georgia, Atlanta Division
January 31, 2024

Case No. 01-22-0002-8503; Virginia Smotherman, Individually and on behalf of the Estate of Pollyanna Smotherman vs. GPM Southeast, LLC and GPM Investments, LLC d/b/a E-Z Mart, and John Doe; In the American Arbitration Association (Arbitration Testimony)
February 20, 2024

Civil Action File No. 22EV001488; V.W. and Adult Female, Plaintiff vs. Simon Property Group, LP; Universal Protection Service, LLC; 3399 Peachtree, LLC; Reef Parking Enterprises, LLC; and Robin Suggs, Defendants; In the State Court of Fulton County, State of Georgia



March 6, 2024

Case No. 2020-CA-001926; Norma Martinez, as personal representative of the Estate of H.R.V., Plaintiff vs. Sana of Jacksonville, Inc., Bones, LLC, Sunshine Restaurant Holdings, LLC and Sunshine Restaurant Merger Sub, LLC, Defendants; In the Circuit Court, Fourth Judicial Circuit, in and for Duval County, Florida
March 22, 2024

Civil Action File No.: 21EV006765; Desmond Hunter, Plaintiff, vs. Marriott Hotel Services, Inc., Atlanta Marriott Suites Midtown, John/Jane Doe Individuals 1-5, and John/Jane Does Entities 1-5, Defendants; In the State Court of Fulton County, State of Georgia
April 11, 2024

Cause No. 2021-20781; Ayad K. Al Dayyeni, Plaintiff vs. Sheng-Raamco Management, Inc. and Raamco RBBC, LLC, f/k/a Raamco Texas Properties, LP, Defendant; In the District Court of Harris County, Texas, 129th Judicial District
April 30, 2024

Civil Action File No. 1:22-cv-01696-VMC; Wyteria Sims and Marcus Chapman o/b/o The Estate of Marcus Sims, Plaintiffs, v. Wingate Management Company, LLC, Defendant; In the United States District Court for the Northern District of Georgia, Atlanta Division
June 12, 2024

Cause No. 2022-06716; Michael Weathersby, Plaintiff vs. Fiesta Mart, LLC, and Bodega Latina Corporation LLC, et al., Defendants; In the District Court of Harris County, Texas, 151st Judicial District
August 23, 2024

Cause No. 2023-64947; Ahshanti Carey, Plaintiff v. Carriage Place Apartments Houston LLC d/b/a Casa Paz Apartments; Devonshire Real Estate & Asset Management, L.P; Devonshire Real Estate Investments, Inc., Fort Grp LLC; and Grow Wealth 2 Retire LLC, Defendants; In the District Court of Harris County, Texas, 127th Judicial District
September 6, 2024

Cause No. CACE22-10752; Tahnisha Thevenin, a Florida Resident, Plaintiff vs. TCB Sport Entertainment LLC, d/b/a Players Sports Bar & Grill; TCB Sports Management, LLC, and The Gori Family Limited Partnership, Defendants; In the Circuit Court of the 17th Judicial Circuit in and for Broward County, Florida, Civil Circuit Division
November 11, 2024

Case No. A-21-832845-C; Mondier Khaira, and Individual, Plaintiff vs. DK One LV LLC, a Foreign Limited Liability Company; One Las Vegas Homeowners' Association, Inc., a Domestic Non-Profit Corporation; FirstService Residential, Nevada, LLC, a Domestic



Limited Liability Company, Defendants; Eighth Judicial District Court, Clark County, Nevada
December 9, 2024

No. D-101-CV-2023-02751; Dennis Murphy, Personal Representative to the Estate of Jayden Vallez, (a minor) deceased; Nanette Andazola, Individually, and Next of Kin, Plaintiffs vs. Angel Chavez, Brookfield Properties Retail, Inc., and Allied Universal, Inc., Defendants, and Brookfield Properties Retail, Inc., Cross-Claimant, vs. Universal Protection Service L.P. d/b/a Allied Universal Security Services, Cross-Claim Defendant; In the First Judicial District Court, County of Santa Fe, State of New Mexico
December 11, 2024

Cause No. 2022-76703; Stacy Langhum, individually and as Administrator of the Estate of Diego Langhum; and Geniah Henderson, as Next Friend of D.L., a Minor Child, Plaintiffs vs. Lurin Real Estate Holdings XV LLC d/b/a The Estates at Avenstar Apartments, and Lurin Property Management, LLC, Defendants; In the District Court of Harris County, Texas, 295th Judicial District
January 8, 2025

Civil Action File No. 21-D-04624-S6; Tanesha Durdan, Plaintiff vs. Red Roof Inns, Inc.; CL West Management, LLC; Michelle Doe, in her capacity as manager, and Dana Doe, in her capacity as manager, Defendants; In the State Court of Gwinnett County, State of Georgia
January 24, 2025

Cause No. 22-2-21294-2 SEA; Delisa Ann Red, as Personal Representative of the Estate of Christopher D. Roberts, Plaintiff vs. Safeway, Inc. et al, Defendants; Superior Court of the State of Washington, in and for King County
February 5, 2025

Civil Action File No. 17-C-07772-S3; Cynthia Welch, Individually, and as Administratrix of the Estate of Anthony L. Welch, Deceased, Plaintiff v. Pappas Restaurants, Inc., Tactical Security Group, LLC, and John Does 1-5, ABC Corp., Def Corp., and XYZ Corp., Defendants; In the State Court of Gwinnett County, State of Georgia
February 13, 2025

Case No. 23-C01565-S4; Craig DeWitt and Dawn DeWitt, as surviving parents of Elijah DeWitt and as Co-Administrators of the Estate of Elijah DeWitt, deceased Plaintiffs v. Simon Property Group, LP, Sugarloaf Mills Limited Partnership, Universal Protection Service, LLC, Jason Choy, and John Does 1-5, Defendants, In the State County of Gwinnett County, State of Georgia.
March 31, 2025



Civil Action No. 4:23-cv-03029; Domimecha Denman, Plaintiff v. Wilhoit Properties, Inc., Mountain Boulevard Apartments, LP, Mountain Boulevard Housing, LLC and Mountain Boulevard Apartments, LP d/b/a Kimberly Pointe Apartments, Defendants; In the United States District Court for the Southern District of Texas, Houston Division
April 9, 2025

Case No. A-22-8621191-C; John Christopher Byers, Plaintiff vs. NP Red Rock LLC, a Nevada Limited Liability Company, d/b/a Red Rock Casino Resort Spa; Does I through X; and Roe Corporations I through X, Inclusive, Defendants; In the Eight District Court, Clark County, Nevada
May 15, 2025

Civil Action File No. 22EV001686; Daniel Kang, Plaintiff vs. Jack's Pizza, LLC, Defendant; In the State Court of Fulton County, State of Georgia
June 19, 2025

Civil Action File No. 1:20-cv-05233-SEG; J.G., Plaintiff vs. Northbrook Industries, Inc., d/b/a United Inn and Suites, Defendant; In the United States District Court for the Northern District of Georgia, Atlanta Division (Trial Testimony July 9-10, 2025)
July 9, 2025

Civil Action No: 1:23cv280; Jane Doe (GMF), an Individual, Plaintiff v. G6 Hospitality, LLC, G6 Hospitality IP, LLC, G6 Hospitality Property, LLC, G6 Hospitality Purchasing, LLC, G6 Hospitality Franchising, LLC, Motel 6 Operating, L.P., and Aesha, LLC; United States District Court, Eastern District of Texas, Beaumont Division
July 24, 2025

Case No. 3:23-cv-00388-IM; A.B., an individual, Plaintiff, v. Interstate Management Company, LLC, doing business as Residence Inn Portland Airport, Defendant; In the United States District Court for the District of Oregon, Portland Division
July 29, 2025

Civil Action File No. 24A03479; Quennariel Martin, as natural Guardian of Zaiyden Hernadez, a minor, and Nina Morris, as natural guardian of Selah Morris, a minor, as next of kins of Carlos Daniels, deceased, Plaintiffs vs. Winters Chapel 592, LLC, Arenda Capital Management, LLC, and Lyon Management Group, Inc., Jeffrey Kent; Doe 1; Doe 2; Doe 3; Doe 4; and Doe 5, Defendants; In the State Court of DeKalb County, State of Georgia
September 15, 2025

Case No. CL24-1943; R.B., by Mother and Next Friend L.B., Plaintiff vs. Marriott International, Inc., et al., Defendants; In the Circuit Court for the City of Norfolk, Virginia
October 9, 2025



Case No. 21C459; Kevin Edward Craft and Rebekah Leanne Craft, Plaintiffs vs. Public Storage, Inc. and Kelvin Edwards, Defendants; In the Circuit Court for Davidson County, Tennessee at Nashville
October 29, 2025

Case No. 2024CV0056250; Randolph Ricketts, Plaintiffs vs. HGH Partners, LLC, d/b/a Foxwood Townhome Apartments, a Georgia limited liability company, Defendant; In the State Court of Houston County, State of Georgia
November 11, 2025

Case No. 3:23-cv-00388-IM; A.B., an individual, Plaintiff, v. Interstate Management Company, LLC, doing business as Residence Inn Portland Airport, Defendant; In the United States District Court for the District of Oregon, Portland Division (Trial Testimony)
December 4, 2025

Cause No. 2023-153-5; Destiny Rosas, Steve Rosas, Consuela Monique Rosas, James Rosas, and Danyel Dowling, Plaintiffs v. QuikTrip Corporation, QT South, LLC, and Byron Otis Bryant; In the District Court of McLennan County, Texas, 414th Judicial District
December 16, 2025

Cause No. 2019DCV3471. Jessica Garcia, Individually and as Next Friend of Guillermo Garcia, and as Next Friend of K.G. and G.G., Minors, et al., Plaintiffs, and Aurora Bonilla Hernandez, Individually, and as Representative of the Estate of Maribel Hernandez Loya, Deceased, et al., Intervenors, v. Walmart, Inc., et al., Defendants. In the 448th Judicial District Court, El Paso County, Texas.
December 19, 2025

Cause No. 2023-153-5; Destiny Rosas, Steve Rosas, Consuela Monique Rosas, James Rosas, and Danyel Dowling, Plaintiffs v. QuikTrip Corporation, QT South, LLC, and Byron Otis Bryant; In the District Court of McLennan County, Texas, 414th Judicial District (Trial Testimony)
January 15, 2026

Civil Action File No. 2024-SV-000382; Jonathan Smith, as the administrator of the Estate of Jason Smith, and Gayle Eldert and Jonathan Smith, as the surviving parents, Plaintiffs vs. Avita Community Partners, d/b/a Behavioral Health Crisis Center, Brandon Lewis, Manolo Cabasal, Hall County, E.K.G. Security, Inc., and Salveo Integrative Heath, Inc., Defendants; In the State Court of Hall County, State of Georgia
February 4, 2026



## COMPENSATION

My time is billed at $950 per hour.  To date, I received a 20-hour retainer.



## APPENDIX A:  Curriculum Vitae of Karim Vellani

### Professional Experience Summary

Karim Vellani is President of Threat Analysis Group, LLC, an independent security consulting firm. Board Certified in Security Management (CPP) and as a Security Consultant (CSC), he has over 30 years of experience in security management. He holds a bachelor's degree in Criminal Justice and a master's degree in Criminal Justice Management. He is the author of *Applied Crime Analysis, Strategic Security Management,* and *Unraveled: An Evidence-Based Approach to Understanding and Preventing Crime*, and has contributed to many other security publications and journals. Karim collaborates on research initiatives focused on preventing violent crime, workplace violence, and sex trafficking. As an Adjunct Professor at the University of Houston–Downtown, he taught graduate-level courses in Security Management and Risk Analysis. He has trained police and security officers in firearms use and the application of force and frequently serves as an instructor for professional security organizations.

As an independent security consultant, Karim has advised Fortune 500 companies and government agencies on security risk management and force protection. He regularly consults for government, commercial, and residential sites across the country, with a portfolio including data centers, healthcare facilities, houses of worship, manufacturing plants, financial institutions, retail stores, shopping centers and malls, hotels and motels, office buildings, and residential housing. For 11 years, Karim was responsible for managing the quality control/assurance function for the U.S. Department of Homeland Security's protection force at federal buildings in 23 states.

Karim specializes in crime analysis and security risk assessment. He developed a crime analysis methodology and software application based on the FBI's Uniform Crime Reporting system, enabling users to identify threats, select effective countermeasures, and mitigate risks. First introduced in Applied Crime Analysis and expanded in Unraveled, this methodology has been applied in threat assessments for thousands of facilities. He also created the Security Risk Assessment Methodology for Healthcare Facilities, published by the International Association for Healthcare Security & Safety (IAHSS) in 2009. In 2023, Karim authored the IAHSS Human Trafficking Victim Identification and Response guideline and served on the ASIS International Technical Committee for the Risk Assessment Standard.

Karim is an active member of several professional organizations, including the International Association of Professional Security Consultants (IAPSC), ASIS International, the American Society of Criminology (ASC), the American Society of Evidence-Based Policing (ASEBP), the International Association of Crime Analysts (IACA), the International Association of Chiefs of Police (IACP), and the International Association for Healthcare Security & Safety (IAHSS). He previously served as President of the IAPSC and as Chair of both the IAHSS Foundation's Evidence-Based Research Committee and the IAPSC's Evidence-Based Security Practices Committee. He currently serves as a member of the IAPSC Forensic Committee. In 2025, Karim was honored with the Charles A. Sennewald Distinguished Service Accolade by the IAPSC in recognition of his contributions to the security consulting profession.



## Current Employment

### *Threat Analysis Group, LLC*
President & Independent Security Consultant

- Security Metrics & ROI: Conduct ROI analyses for crime prevention investments; perform crime analysis and benchmarking to support data-driven decision-making

- Risk Management: Lead threat and vulnerability assessments; develop quantitative risk models to measure exposure and prioritize mitigation strategies

- Operational Optimization: Develop and refine security policies, staffing models, and procedures; advise on force allocation, procurement, and vendor selection

- Technology Advisory: Provide vendor-independent consultation on access control, intrusion detection, video management, and communications systems

- Research & Innovation: Conduct evidence-based research on crime prevention, with emphasis on threat assessment, violent crime, sex trafficking, and workplace violence

## Past Employment

### *University of Houston – Downtown*
Adjunct Professor

- Taught graduate courses in Security Management and Risk Analysis in the Master's Program at the University's College of Criminal Justice..

### *Texas One Security*
Operations Manager

- Managed a security force of over 100 officers, overseeing approximately 1,400 guard hours across 17 client sites.

- Directed hiring, training, deployment, scheduling, and performance evaluations to ensure operational effectiveness.

- Ensured full compliance with State Private Security rules and regulations for both personnel and company operations.

### *Operational Support Services, Inc.*
Law Enforcement Advisor/Security Consultant



- Provided security consulting services to law enforcement agencies, private security firms, government entities

- Conducted threat and vulnerability assessments to evaluate client risk and inform mitigation strategies

### *North Harris College*
Instructor

- Trained police and security officers in firearms use, safety, and qualification standards

- Instructed security personnel on legal topics including use of force, deadly force, and profiling

### *Roehling Corporate International Investigations, Inc.*
Private Investigator

- Provided investigative services to the legal profession, insurance companies, and private corporations

- Served on search team for Oklahoma escaped convict Randolph Franklin Dial

## Certifications & Licenses

Board Certified Security Consultant (CSC)
International Association of Professional Security Consultants (IAPSC)

Board Certified in Security Management (CPP)
American Society for Industrial Security - International (ASIS)

Board Certified Protection Officer (CPO)
International Foundation for Protection Officers

Board Certified Police Firearms Instructor
National Rifle Association of America

## Education & Training

Master of Science, Criminal Justice Management, Sam Houston State University, August 1998

Bachelor of Science, Criminal Justice (Specialization in Law Enforcement / Police Science), Sam Houston State University, August 1994



An Analyst's Role in a Homicide Investigation, International Association of Crime Analysts

Certified Protection Officer Course, International Foundation for Protection Officers

Certified Protection Professional Course, American Society for Industrial Security – International

Concealed Handgun Instructor Course, Texas Department of Public Safety

Criminal Profiling in Crime Analysis, International Association of Crime Analysts

Gang Crimes, Montgomery County Sheriff's Department

How Anti-Money Laundering Investigators Follow the Money for Human Trafficking, Houston InfraGard Countering Human Trafficking Cross Sector Council

Identifying and Managing Risky Facilities, International Association of Professional Security Consultants

Identifying Crime and Crash Patterns, Analyst Mastermind Series, International Association of Directors of Law Enforcement

Instructors Course, Texas Commission on Law Enforcement Standards and Education

Introduction to Child Sex Trafficking, National Center for Missing and Exploited Children

Level One Training, Texas Private Security Bureau

Personal Protection and Home Safety Instructor, National Rifle Association of America

Pistol, Rifle and Shotgun Instructor, National Rifle Association of America

Police Firearms Instructor, National Rifle Association of America

**Professional Affiliations**

American Society of Criminology (ASC)

American Society of Evidence-Based Policing (ASEBP)

American Society for Industrial Security - International (ASIS)



Federal Bureau of Investigation (FBI) InfraGard

International Association of Chiefs of Police (IACP)

International Association of Crime Analysts (IACA)

International Association for Healthcare Security & Safety (IAHSS)

International Association of Professional Security Consultants (IAPSC)

## Accomplishments

Chair, Evidence-Based Security Practices Committee, 2022 - Present
International Association of Professional Security Consultants (IAPSC)

Member, Forensic Security Committee, 2004 – Present
International Association of Professional Security Consultants (IAPSC)

Chair, Evidence Based Research Committee, 2015 - 2020
International Association of Healthcare Security and Safety Foundation

Member, Board of Directors, 2013 – 2020
International Healthcare Security and Safety Foundation

Member, Use of Force Best Practice Committee, 2019 – 2020
International Association of Professional Security Consultants (IAPSC)

Technical Committee Member, Enterprise Security Risk Management (ESRM) Guideline, 2019 - 2020
American Society for Industrial Security - International (ASIS)

Technical Committee Member, Private Security Officer Selection and Training Guideline, 2017 - 2018
American Society for Industrial Security - International (ASIS)

Member, Security Metrics/Data Task Force, 2016-2019
International Association of Healthcare Security and Safety

Technical Committee Member, Private Security Officer (ANSI Standard), 2015 - 2017
American Society for Industrial Security - International (ASIS)

Member, Board of Directors, 2011 - 2015
International Association of Professional Security Consultants (IAPSC)



Technical Committee Member, Risk Assessment (ANSI Standard), 2013 - 2016
American Society for Industrial Security - International (ASIS)

Chairman, Council on Advocacy, 2011 - 2012
International Association for Healthcare Security & Safety (IAHSS)

Advisory Member, Security Lighting for People, Property, and Critical Infrastructure Guideline (G-1-16), 2011 – 2017
Illuminating Engineering Society of North America (IESNA)

Technical Committee Member, Private Security Company (ANSI Standard), 2012 - 2013
Maturity Model for the Phased Implementation of a Quality Assurance Management System for Private Security Service Providers (PSC.3) Standard
American Society for Industrial Security - International (ASIS)

Technical Committee Member, Private Security Company (ANSI Standard), 2011 - 2012
Conformity Assessment and Auditing Management System for Quality of Private Security Company Operations (PSC.2) Standard
American Society for Industrial Security - International (ASIS)

Technical Committee Member, Private Security Company (ANSI Standard), 2011 – 2012
Management System for Quality of Private Security Company Operations (PSC.1)
American Society for Industrial Security - International (ASIS)

Technical Committee Member, Physical Asset Protection (ANSI Standard), 2011 - 2012
American Society for Industrial Security - International (ASIS)

Immediate Past President, 2009 - 2011
International Association of Professional Security Consultants (IAPSC)

President, 2008 - 2009
International Association of Professional Security Consultants (IAPSC)

Vice President, 2007 - 2008
International Association of Professional Security Consultants (IAPSC)

Secretary, 2006 - 2007
International Association of Professional Security Consultants (IAPSC)

Member, Board of Directors, 2004 - 2006
International Association of Professional Security Consultants (IAPSC)

Chairman, Professional Certification Committee, 2004 - 2006



International Association of Professional Security Consultants (IAPSC)

Member, Private Security Services Council, 2005 – 2006
American Society for Industrial Security - International (ASIS)

Chairman, Certifications Committee, 2004 - 2006
American Society for Industrial Security - International (ASIS) - Houston Chapter

Chairman, By-Laws Committee, 2004
International Association of Professional Security Consultants (IAPSC)

Chairman, Certified Protection Professional Committee, 2002 - 2003
American Society for Industrial Security - International (ASIS) - Houston Chapter

Committee Member, Publications Committee, 2001 - 2002
International Association of Crime Analysts (IACA)


## Publications & Presentations

Vellani, K. (2026).  Strategic Security Management:  A Risk Assessment Guide for Decision Makers, Third Edition.  Boca Raton, FL: Taylor & Francis CRC Press.

Perez, K. L., Kaufer, S., Silva, M. A., Vellani, K., & Zajic, A. W. (2025). Place Management for Apartment Crime Prevention (EBSP-25-02). Evidence-Based Security Practices, International Association of Professional Security Consultants.

Vellani, K. (2025).  "Forensic Methodology – The Gold Standard for Expert Witnesses" (Panelist). Annual Conference, International Association of Professional Security Consultants, San Diego, CA, May 1, 2025.

Vellani, K. Kaufer, S.; & Army, C. (2024). A Refined Violent Crime Typology: Analyzing and Solving Specific Types of Violence. ASU Center for Problem-Oriented Policing.

Vellani, K. (2023).  "Transitioning to Evidence-Based Security Practices." ASIS - International. Houston, TX, November 8, 2023.

Vellani, K. (2023).  "Using Evidence-Based Research to Understand and Prevent Crime." Evidence-Based Security Practices Committee, International Association of Professional Security Consultants, January 24, 2023.

Army, C. & Vellani, K. (2023). Risky Behaviors and Violent Victimization (EBSP-23-01). Evidence-Based Security Practices, International Association of Professional Security Consultants.



Vellani, K. (2022). "Using Evidence-Based Research to Understand and Prevent Crime." 37th Annual Conference, International Association of Professional Security Consultants, Denver, CO, June 14, 2022.

Vellani, K. (2022). "Assessing Crime Risk." Fundamentals in Forensic Security Consulting, International Association of Professional Security Consultants, Denver, CO, June 13, 2022.

Vellani, K., & Kristof, T.S. (2022). "Security's Critical Role in Combating Sex Trafficking." Journal of Healthcare Protection Management, Volume 76, Number 1, International Association for Healthcare Security & Safety.

Vellani, K. (2021). Unraveled: An Evidence-Based Approach to Understanding and Preventing Crime. Threat Analysis Group, LLC.

Vellani, K. (2021). "Mitigating Security Risks with Evidence-Based Research." Hospital Association of Southern California, November 3, 2021.

Army, C. & Vellani, K. (2021). Violent Crime Typology and Continuum. CrimRxiv. https://doi.org/10.21428/cb6ab371.71ec923d

Vellani, K. & Kristof, T.S. (2021). Identifying and Responding to Sex Trafficking Victims in Healthcare Environments. CrimRxiv. https://doi.org/10.21428/cb6ab371.84ddfc71

Vellani, K. and Kristof, T.S. (2021). "Results of the 2020 Healthcare Crime Survey." Journal of Healthcare Protection Management, Volume 36, Number 1, International Association for Healthcare Security & Safety.

Vellani, K.; Warren, B.; Young, J. (2020). "The Impact of COVID-19 on Healthcare Facilities." International Association of Healthcare Security and Safety, October 28, 2020.

Pompeii, L. A., Benavides, E., Pop, O., Rojas, Y., Emery, R. J., Delclos, G. L., Markham, C. M., Oluyomi, A. O., Vellani, K., & Levine, N. (2020). Workplace Violence in Outpatient Physician Clinics: A Systematic Review. International Journal of Environmental Research and Public Health, 17, 6587. https://doi.org/10.3390/ijerph17186587

Vellani, K. (2020). "Impressing Your Boss: Using the IAHSS Foundation's Crime Survey and Other Foundation Research to Improve Your Program." International Association of Healthcare Security and Safety, Virtual Conference, September 1, 2020.

Vellani, K. (2020). "2020 Healthcare Crime Survey." International Healthcare Security and Safety Foundation.



Vellani, K. (2019).  Strategic Security Management:  A Risk Assessment Guide for Decision Makers, Second Edition.  Boca Raton, FL: Taylor & Francis CRC Press.

Vellani, K. (2019).  "Evidence, Anecdotes, and Actions:  A Summary of the 2019 Healthcare Crime Survey and other IAHSS Foundation Research." Journal of Healthcare Protection Management, Volume 35, Number 2, International Association for Healthcare Security & Safety.

Vellani, K. (2019).  "2019 Healthcare Crime Survey."  International Association of Healthcare Security and Safety, Orlando, FL, May 21, 2019.

Vellani, K. (2019).  "How Many Security Officers Do You Need? An Evidence-based Approach to Determining the Industry Average Number of Hospital Security Officers."  International Association of Healthcare Security and Safety, Orlando, FL, May 20, 2019.

Vellani, K., D'Angelo, M.S & Wheatley, K. (2019).  "Vetting Clients:  From First Call Through Final Report." 35th Annual Conference, Miami, FL, International Association of Professional Security Consultants, May 5, 2019.

Vellani, K. (2019).  "2019 Healthcare Crime Survey."  International Healthcare Security and Safety Foundation.

Vellani, K.,  Emery, R.J., Conway, S.H. & Pompeii, L.A. (2019).  "A Refined Model for Estimating the Industry-Average Number of Security Staff for Hospitals." Journal of Healthcare Protection Management, Volume 35, Number 1, International Association for Healthcare Security & Safety.

Vellani, K. (2018).  "Threat Assessment in the Private Sector: Application of the IAPSC Forensic Methodology Threat Assessment Section Outside of Litigation." 34th Annual Conference, San Diego, California, International Association of Professional Security Consultants, April 30, 2018.

Vellani, K. (2017).  "Violence Against Healthcare Workers:  Persistent Trends and Appropriate Responses."  Journal of Healthcare Protection Management, Volume 32, Number 2, International Association for Healthcare Security & Safety.

Vellani, K. (2017).  "2017 Healthcare Crime Survey."  International Healthcare Security and Safety Foundation.

Vellani, K. (2016).  "The Battle against Violence in U.S. Hospitals."  Journal of Healthcare Protection Management, Volume 32, Number 2, International Association for Healthcare Security & Safety.



Vellani, K. (2016).  "2016 Healthcare Crime Survey."  International Healthcare Security and Safety Foundation.

Vellani, K. (2015).  "Arming Security Officers" (Panelist).  International Association of Healthcare Security and Safety, Houston, Texas, November 13, 2015.

Vellani, K. (2015).  "Statistics as a Security Management Tool" in Charles A. Sennewald's Effective Security Management, 6th Edition.  Woburn:  Elsevier.

Vellani, K. (2015).  "Workplace Violence." Greater Houston Industrial Hygiene Council, Houston, TX, June 18, 2015.

Vellani, K. (2015). "Security Risk Assessments." Greater Houston Industrial Hygiene Council, Houston, TX, June 18, 2015.

Vellani, K. (2015). "2015 Healthcare Crime Survey."  International Association of Healthcare Security and Safety, St. Louis, MO, May 5, 2015.

Vellani, K. (2015). "2015 Healthcare Crime Survey."  International Healthcare Security and Safety Foundation.

Vellani, K., Emery, R.J., & Reingle Gonzalez, J.M. (2015).  "A Data-Driven Model for Estimating Industry Average Numbers of Hospital Security Staff." Journal of Healthcare Protection Management, Volume 31, Number 1, International Association for Healthcare Security & Safety.

Vellani, K. (2015).  Foreword to Michael S. D'Angelo's From Police to Security Professional: A Guide to a Successful Career Transition.  Boca Raton:  CRC Press.

Vellani, K. (2014).  "Reducing Violence in Healthcare Facilities."  International Association of Healthcare Security and Safety, Houston, Texas, July 19, 2014.

Vellani, K. (2014). "2014 Healthcare Crime Survey."  International Association of Healthcare Security and Safety, San Diego, CA, May 20, 2014.

Vellani, K. (2014). "2014 Healthcare Crime Survey."  International Healthcare Security and Safety Foundation.

Vellani, K. (2014).  "Reducing Violence in Healthcare Facilities."  Journal of Healthcare Protection Management, Volume 30, Number 1, International Association for Healthcare Security & Safety.



Vellani, K. (2013).   "The Business Plan and Successful Security Partnering" Successful Security Consulting Seminar, International Association of Professional Security Consultants and ASIS - International.  Chicago, IL, September 23, 2013.

Vellani, K. (2012).   "The Need for Effective Consulting Websites" in Charles A. Sennewald's Security Consulting, 4th Edition.  Woburn:  Elsevier.

Vellani, K. (2012).   "Security Staffing:  Madness to Methods to Outcomes."  International Association of Healthcare Security and Safety, Houston, Texas, October 12, 2012.

Vellani, K., Bates, N. & Kaufer, S. (2012). "Security 2012 – The Latest        Trends in Crime Analysis, Security Technology and Management Practices for Inadequate Security Litigators." National Crime Victim Bar Association, New Orleans, LA, September 21, 2012.

Vellani, K., Emery, R.J. & Parker, N. (2012).   "Staffing Benchmarks:  How Many Security Officers are Enough?"  Journal of Healthcare Protection Management, Volume 28, Number 2, International Association for Healthcare Security & Safety.

Vellani, K. (2011).   "Using Crime Analysis to Solve Problems in 15 Small Steps."  Journal of Healthcare Protection Management, Volume 27, Number 2, International Association for Healthcare Security & Safety.

Vellani, K. (2011).   "Crime Analysis:  A Framework for Optimizing Security."  International Association of Healthcare Security and Safety, Toronto, Ontario, May 24, 2011.

Vellani, K. (2011).   "Statistics as a Security Management Tool" in Charles A. Sennewald's Effective Security Management, 5th Edition.  Woburn:  Butterworth-Heinemann.

Vellani, K. and Gouin, B. (2010).   "Security Risk Assessments in the Environment of Care." American Society of Healthcare Risk Management, Tampa, FL, October 15, 2010.

Vellani, K. (2010).   "The Business Plan and Successful Security Partnering" Successful Security Consulting Seminar, International Association of Professional Security Consultants and ASIS - International.  Dallas, TX, October 11, 2010.

Vellani, K. (2010). "Security Risk Assessments." Texas Regional Conference, The Woodlands, Texas, International Association of Professional Security Consultants, September 15, 2010.

Vellani, K. (2010) "Crime Analysis for Problem Solving Security Professionals in 25 Small Steps."  Center for Problem Oriented Policing www.popcenter.org .

Vellani, K. (2010).  "Crime Analysis:  Assessing Threats to Optimize Security."  Threat Analysis Group, LLC.  Available via Amazon.com.



Vellani, K. (2010).   "Crime Analysis:   Optimizing Security in Healthcare Facilities." International Association of Healthcare Security and Safety, Houston, Texas, May 21, 2010.

Vellani, K. (2010).  "Crime Analysis:  A Framework for Optimizing Security and Assessing Foreseeability."  26th Annual Conference, Savannah, Georgia, International Association of Professional Security Consultants, April 26, 2010.

Vellani, K. (2009).   "Security Risk Assessments."   Security 101 for Health and Safety Professionals, Southwest Center for Occupational & Environmental Health, School of Public Health, University of Texas, October 29, 2009.

Vellani, K. (2009).   "The Business Plan and Successful Security Partnering" Successful Security Consulting Seminar, International Association of Professional Security Consultants and ASIS - International.  Anaheim, CA, September 20, 2009; Dallas, TX, October 11, 2010; Orlando, FL, September 18, 2011.

Vellani, K. (2009).   "Security Risk Assessments."   Healthcare Security:  Basic Industry Guidelines, January 2009, International Association for Healthcare Security & Safety.

Vellani, K. (2008).  "Data Driven Security."  Security Solutions Series, Threat Analysis Group, LLC.

Vellani, K. (2008).  "Risk Assessments in the Environment of Care."  Wisconsin Healthcare Engineering Association, October 29, 2008.

Vellani, K. (2008).  "The Uniform Crime Reporting System" in Charles A. Sennewald and John H. Christman's Retail Crime, Security, and Loss Prevention:  An Encyclopedic Reference. Woburn:  Butterworth-Heinemann.

Vellani, K. (2008).  "Threat Assessment in the Retail Environment" in Charles A. Sennewald and John H. Christman's Retail Crime, Security, and Loss Prevention:  An Encyclopedic Reference. Woburn:  Butterworth-Heinemann.

Vellani, K. (2007).   "Security Risk Assessments."   Security 101 for Health and Safety Professionals, Southwest Center for Occupational & Environmental Health, School of Public Health, University of Texas, November 14, 2007.

Vellani, K. and Owles, R.E. (2007).  "Vulnerability and Risk Assessments in the Environment of Care."  Journal of Healthcare Protection Management, Volume 24, Number 1, International Association for Healthcare Security & Safety.

Vellani, K. (2007).   Foreword to Brian Gouin's Physical Security Consulting.   Woburn: Butterworth-Heinemann.



Vellani, K. (2007).  "The Gentle Art of Threat Assessment."  Journal of Healthcare Protection Management, Volume 23, Number 1, International Association for Healthcare Security & Safety.

Vellani, K. (2006).  "Crime Analysis" in John J. Fay's Encyclopedia of Security Management: Techniques and Technology, 2nd Edition.  Woburn:  Butterworth-Heinemann.

Vellani, K. (2006).  "Security Risk Assessments in the Environment of Care."  International Association of Healthcare Security and Safety, Houston, Texas, May 21, 2010.

Vellani, K. (2006).  Strategic Security Management:  A Risk Assessment Guide for Decision Makers. Woburn:  Butterworth-Heinemann.

Vellani, K. (2006).  "Strategic Security Management:  Risk Assessments in the Environment of Care."  Journal of Healthcare Protection Management, Volume 22, Number 2, International Association for Healthcare Security & Safety.

Vellani, K. (2005).  "Certified Security Consultant." Successful Security Consulting Seminar, International Association of Professional Security Consultants.  Orlando, FL, September 10, 2005.

Vellani, K. (2005).  "Crime and Foreseeability Analysis." The Sentry.  American Society for Industrial Security - International: Houston Chapter.  June, 2005.

Vellani, K. (2004).  "Crime and Foreseeability Analysis." The Independent Security Consultant. International Association of Professional Security Consultants.  Fall, 2004.

Vellani, K. and Sennewald, C.A. (2004).  Consultants as a Protection Resource, Protection of Assets Manual.  Alexandria: ASIS International.

Vellani, K. (2004).   "The Business Plan." Successful Security Consulting Seminar, International Association of Professional Security Consultants.  Dallas, TX, September 25, 2004; Carefree, AZ, May 7, 2006; San Diego, CA, September 24, 2006.

Vellani, K. (2004).  "Writing Effective Proposals" International Association of Professional Security Consultants.  Newport Beach, CA, April 27, 2004.

Vellani, K. (2004).   "Boosting Performance and Morale."  Security Business Practices Reference, Volume 6, ASIS Council on Business Practices, ASIS International.

Vellani, K. (2004).  "Achieving Return on Investment from Crime Analysis."  Security Business Practices Reference, Volume 6, ASIS Council on Business Practices, ASIS International.



Vellani, K. (2003).  "Security Solutions for Strip Shopping Centers."  Security Solutions Series, Threat Analysis Group, LLC, 2003.

Vellani, K. (2003).  "Security Solutions for Grocery Stores."  Security Solutions Series, Threat Analysis Group, LLC, 2003.

Vellani, K. and Batterson, M. (2003).  "Security Solutions for Banks."  Security Solutions Series, Threat Analysis Group, LLC, 2003.

Vellani, K. (2003).  "Statistics as a Security Management Tool" in Charles A. Sennewald's Effective Security Management, 4th Edition.  Woburn:  Butterworth-Heinemann.

Vellani, K. (2002).  "Crime Analysis:  The First Step in Creating an Effective Crime Prevention Program."  Security Business Practices Reference, Volume 5, ASIS Council on Business Practices, ASIS International.

Vellani, K. (2002).  "Crime Analysis in the Medical Environment."  Workplace Safety Seminar, School of Public Health, University of Texas Health Science Center, December 2, 2002.

Vellani, K. (2002).  "Risk Analysis" University of Houston - Downtown.  CJ 5360: Security and Crisis Management: Theories and Practices, April 8, 2002.

Vellani, K. (2002).  "Crime Analysis Literature: What We Have and Where We Are Going." Forecaster, International Association of Crime Analysts, Spring 2002.

Vellani, K. (2001).  "Rape Zones: Are Some Neighborhoods More Prone To Sexual Assault?" KHOU 11, Houston, Texas.  Aired November 25, 2001.

Vellani, K. (2001).  "Crime Analysis: The First Step in Creating an Effective Crime Prevention Program."  47th Annual Seminar & Exhibit, San Antonio, Texas, American Society for Industrial Security, October 1, 2001.

Vellani, K. (2001).  "Don't Let Your Guard Down."  Security Management, American Society for Industrial Security, October 2001.  Edited extensively by Security Management editors.

Vellani, K. (March 29, 2000).  "Convenience Store Security."  Presented to Pakistan Association of Greater Houston (PAGH).

Vellani, K. and Nahoun, N.D. (2001).  Applied Crime Analysis.  Woburn:  Butterworth-Heinemann.

Vellani, K. (2000).  "Security + Service = Satisfaction: The Perks of Private Security."  Journal of Property Management, Institute of Real Estate Management, May/June 2000.



Vellani, K. (1999).  "Crime Stoppers."  Journal of Property Management, Institute of Real Estate Management, September/October 1999.

Vellani, K. (1998).  "Management Ideas for Preventing Crime:  An Analysis of Liability, Site-Specific Crime Prevention, Crime Prevention Through Environmental Design, and Violence Escalation."  Sam Houston State University, Huntsville, Texas.



*RR v. ESA P Portfolio L.L.C.*

**APPENDIX B:  Forensic Methodology**





# FORENSIC METHODOLOGY

Rev. January 23, 2025



## FORENSIC METHODOLOGY

The International Association of Professional Security Consultants has issued this consensus-based and peer-reviewed[1] Methodology for the guidance of and voluntary use by businesses and individuals who deal or may deal with the issues addressed in the context of third-party premises security litigation, and other security-related cases where the methodology would be helpful. The Forensic Methodology has been reviewed and accepted by several Federal District courts throughout the United States.

## Table of Contents

**POSITION STATEMENT** ...................................................................................3

**EVIDENCE REVIEW - THE PROCESS** ...............................................................4

**SECURITY RISK ASSESSMENT** .......................................................................5

**THREAT ASSESSMENT** ..................................................................................6

**VULNERABILITY ASSESSMENT/ SECURITY SURVEY** .......................................7

**ANALYSIS AND OPINIONS** ............................................................................9

**BIBLIOGRAPHY/REFERENCES** ......................................................................10

**FORENSIC SECURITY COMMITTEE MEMBERS** ..............................................13

**CASES CITING METHODOLOGY** ...................................................................14

**REVISION HISTORY** .....................................................................................15

**ABOUT THE IAPSC** .....................................................................................16

---

[1] Peer review is defined as evaluation of scientific, academic, or professional work by others working in the same field.



**FORENSIC METHODOLOGY**

## POSITION STATEMENT

The International Association of Professional Security Consultants does hereby recognize that its members will be called upon to perform as "Forensic Consultants" and serve as Expert Witnesses in a court of law or other legal proceeding. The purpose of these guidelines is to meet the need for a standardized methodology used in the evaluation of premises security cases.

It is recognized that the task of the Forensic Consultant is one of education. Forensic Consultants will provide their opinion(s) to the client, to opposing counsel during deposition, in response to written interrogatories, in reports, and to the judge and jury at trial or any other lawfully convened hearing. This is done with the goal of making others aware of the security issues and contributing to a just and proper conclusion on the litigation.

The responsibility of the Forensic Consultant lies within our system of justice and the ethics of the security profession. The opinions so offered are made as an objective expert witness/consultant, without any financial or other interest in the outcome of the litigation.

Forensic Consultants will, at all times, be forthright, honest, and precise in evolving the ultimate conclusion(s) and opinion(s). The opinion(s) will be the result of a review of all available, applicable documentation and discovery material presented by all parties to the litigation. Site inspections and analytical procedures generally followed by the Forensic Consultant are described in these guidelines.

The following methodology is to be used in a typical premises security case, including crimes committed by employees; workplace violence; negligent hiring, supervision and retention; negligent training; use of force; invasion of privacy; wrongful arrest and/or imprisonment; wrongful prosecution; and other security-related cases.

The Forensic Consultant is expected to exercise diligence in requesting and/or obtaining information that the Consultant reasonably believes is relevant to the facts and circumstances of the case.

*It is reasonable to expect variations of the steps, with some steps deleted and others added as the facts and circumstances of the case being analyzed warrant. Further, it is reasonable to expect a division of the methodology's steps when more than one expert is retained on behalf of a party.*



**FORENSIC METHODOLOGY**

**EVIDENCE REVIEW - THE PROCESS**

In the context of this Guideline, the Forensic Consultant will review and analyze various information, whether produced during the discovery process of the litigation or otherwise obtained through research, common knowledge, investigation, and/or the consultant/expert's experience which allows the Consultant to identify factors leading to an understanding of the crime risks present at the time of the criminal event.

Types of evidence generally available to the Forensic Consultant may include, if relevant, the following:

1.  Complaint/Petition and Pleadings

2.  Police Report of the subject incident

3.  Site and Immediate Vicinity Crime History, including police and security incident reports

4.  Interrogatories and Responses

5.  Requests for Production of Documents and Responses, discovery motions

6.  Requests for Admissions and Responses

7.  Affidavits, Witness Statements, and Interviews

8.  Depositions with exhibits

9.  Expert Witness Reports and Depositions

10. Applicable Medical Records Relating to the Facts of the Incident

11. Photographs, Video and Audio Recordings, etc.

12. Other Related Evidence (e.g., prosecutors file, if available, criminal trial transcript, employee HR files, etc.)

13. Site Plans

14. Applicable standards, codes, and regulations

15. Publications related to the standard of care

16. Lighting plans/diagrams

17. Relevant policies and procedures

18. Security staffing, plans, manuals, post orders and schedules

19. Security services contracts in effect on date of loss

20. Agreements with other security service providers (e.g., off-duty police officers)

21. Background search results of employees/workers



Page 4

**SECURITY RISK ASSESSMENT**

A security risk assessment is the general process of identifying relevant risks, given the facts of the case, and based on the materials identified in the evidence review process. It is a qualitative, quantitative, or hybrid assessment that seeks to determine the likelihood that criminals could successfully exploit a vulnerability or compromise a security countermeasure.

There are two main components to a security risk assessment: a threat assessment and a vulnerability assessment. The threat assessment is an evaluation of the various sources of crime threats. The vulnerability assessment includes an evaluation of the physical aspects of the facility and an analysis of the overall security program as it relates to the specific facts of the case.

The security survey, along with documented evidence, is how the security measures utilized and/or available at the facility at the time of the incident, which is the subject of the litigation, are identified and analyzed.

A security risk assessment provides the foundation for effectively determining the adequacy of countermeasures employed.





**FORENSIC METHODOLOGY**

**THREAT ASSESSMENT**

A threat assessment is an evaluation of events that can adversely affect operations and/or specific assets. Historical information is a primary source for threat assessments, including past criminal and terrorist events. A threat assessment considers actual and inherent threats.

1.  Actual Threats - The crime history at the subject property based on data reflecting actual crime data. Depending on the police jurisdiction that serves the subject property, different types of crime records may be available. The most common type of crime record used in a crime risk analysis is Calls for Service. It is important to note that Calls for Service accuracy varies by jurisdiction. Further, changes to incident management and dispatch systems may also impact accuracy even within the same jurisdiction. When assessing relevant crimes, Calls for Service should not be used alone. Offense/Incident Reports are necessary to validate the Calls for Service or dispatch logs, specifically the crime type, crime location, and whether a crime actually occurred. Calls for Service alone, in many jurisdictions, are insufficient for these three elements. Actual threats are a quantitative element of a threat assessment. When assessing actual threats, the following may be considered as deemed relevant by the security expert:

    a.  Relevant crimes on the subject property for a three to five-year period prior to the date of the incident.

    b.  Relevant crimes in the immediate vicinity of the subject property for a three to five-year period prior to the date of the incident. [Note: There is no single definition of what constitutes an "immediate vicinity" or "neighborhood" around a given property. Often what is available for evaluation from a law enforcement agency depends upon that agency's software programming and/or staff capabilities (e.g., the agency can only provide data for a set size of an area, such as a quarter mile radius).] The IAPSC recognizes that criminology studies and related research have generally found that crime in the area may not be relevant to the subject property.

    c.  The expert may consider the relationship between offenders and victims (e.g. interpersonal, domestic, targeted, etc.).

2.  Inherent Threats – The crime risk at the subject property as determined by the expert based on the property's characteristics, the expert's research and/or experience in similar environments, information gathered through the discovery process, and/or a site inspection (if conducted).



**Page 6**

**FORENSIC METHODOLOGY**

**VULNERABILITY ASSESSMENT/ SECURITY SURVEY**

The vulnerability assessment is an analysis of security weaknesses and opportunities for criminal activity. A security survey is a method for collecting information used in the vulnerability assessment.

A security survey may include a physical survey of the scene of the incident and areas/functions that are applicable to the incident to achieve an understanding of information that has potential application to the matter in litigation.

The following areas of review are not meant to be all inclusive, nor all exclusive. The decision to review the material is at the judgment/discretion of the expert.

1. Incident Review

    a. Police incident and investigation report(s)

    b. Security incident report(s)

    c. Medical records (emergency room and/or autopsy as it relates to information about the occurrence of the incident)

    d. Other sources of information about how the incident occurred (e.g., witness statements testimony, etc.)

2. Site Inspection - Inspect the site where the incident occurred and the surrounding area, if relevant. (Note: Not all cases will require site inspections, nor is it always possible to conduct site views e.g., if the site has been altered substantially or no longer exists.) Further, the facts of some cases and potential liability issues are not related to the site/property layout, design, or other physical attributes. As such, a site inspection may be unnecessary.

    a. Determine layout of the premises

    b. Evaluate relevant factors (lighting, lines of sight, places of concealment, remoteness, accessibility, security measures, conditions, etc.)

    c. Review relevant documentation (lease, contract, diagram, map, etc.)

    d. Assess the characteristics of the surrounding area and what impact, if any, those characteristics may have had on the subject property

**FORENSIC METHODOLOGY**

3.  Security Personnel

    a.  Review security officer(s) (including off-duty law enforcement officers) actions, staffing levels, post orders, duty hours, equipment provided, tours, evaluations, training, hiring procedures and supervision

    b.  Review of law enforcement presence and actions (e.g., on-duty, police details, etc.)

    c.  Review roles and actions of non-security related people who may have participated in the security program and/or incident

    d.  Assess the qualifications and performance of owner/management personnel overseeing the security program

4.  Security Management Program

    a.  Review management and security related policies, procedures, and practices

    b.  Review any security risk assessments performed prior to the date of the incident

    c.  Review daily activity reports, job descriptions, incident reports and internal correspondence

    d.  Review security services contract

    e.  Review training manuals and materials

    f.  Review depositions regarding employees' understanding of their duties, and all customs and undocumented practices

    g.  Evaluate the qualifications, training, and experience of security management and supervisory personnel

5.  Security Equipment

    a.  Review building design and site plans

    b.  Inspect all security devices related to the incident

    c.  Inspect structural security features related to the incident

    d.  Determine the position, function and maintenance status of the relevant security equipment and features in place at the time of the incident

    e.  Determine levels of illumination, if relevant



**ANALYSIS AND OPINIONS**

The security expert will determine the level of adequacy of security at the location of the incident on the date and at the time the incident occurred. This will be based on the information obtained in the previous steps, and the application of a qualitative analysis based on the experience, education, and training of the expert.

Based upon the analysis, the expert will reach conclusions on the issues of risk analysis, preventability, and the adequacy of the security program at the subject property. At this point the expert has formed opinions and is prepared to provide a written report, be deposed, and/or testify at trial. Those opinions will state the detailed basis for the findings, including evidence, standards, best practices, and guidelines, where applicable.





International Association of
Professional Security Consultants

## BIBLIOGRAPHY/REFERENCES

The process of evaluating the risk of crime at a specific location or geographical area is widely recognized and has been adopted nationwide by private industry, public law enforcement, municipalities, and other governmental agencies. The following published sources reference the process used to perform a crime risk analysis. *This is not all-inclusive, but a representative sampling of available references.*

This bibliography is not to be construed in any way as an endorsement by the International Association of Professional Security Consultants of the publications or the respective authors.

- ASIS International. (2024). Security risk assessment standard (ASIS SRA-2024). Alexandria, VA.

- Bates, N. D. (1997). Foreseeability of crime and adequacy of security. In Accident prevention manual for business & industry: Security management. National Safety Council.

- Bates, N. D., & Frank, D. A. (2010). Premises security experts and admissibility considerations under Daubert and Kumho: A revised standard. Suffolk Journal of Trial and Appellate Advocacy.

- Broder, J. F., & Tucker, E. (2012). Risk analysis and the security survey (4th ed.). Butterworth-Heinemann.

- Bureau of Justice Statistics. (n.d.). Glossary: Stranger; Nonstranger. U.S. Department of Justice. https://bjs.ojp.gov/glossary

- Caplan, J. M., & Kennedy, L. W. (2016). Risk terrain modeling: Crime prediction and risk reduction. University of California Press.

- Clarke, R. V., & Eck, J. E. (2007). Understanding risky facilities (Problem-Specific Guide Series). Office of Community Oriented Policing Services, U.S. Department of Justice.

- Crowe, T. D., & Fennelly, L. (2013). Crime prevention through environmental design (3rd ed.). Butterworth-Heinemann.

- Department of the Navy, Naval Facilities Engineering Command. (1983). Physical security design manual 13.1. Government Printing Office.

- Eck, J. E., & Weisburd, D. (1995). Crime and place: Crime prevention studies (Vol. 4). Criminal Justice Press.



- Eck, J. E., Clarke, R. V., & Guerette, R. T. (2007). Risky facilities: Crime concentration in homogeneous sets of establishments and facilities. In G. Farrell et al. (Eds.), Imagination for crime prevention (Crime Prevention Studies, Vol. 21. Criminal Justice Press.

- Eck, J. E., Linning, S. J., & Herold, T. D. (2023). Place management and crime: Ownership and property rights as a source of social control. SpringerBriefs in Criminology.

- Federal Bureau of Investigation. (2004). Uniform crime reporting handbook. U.S. Department of Justice.

- Gottlieb, S., Arenberg, S., & Singh, R. (1998). Crime analysis: From first report to final arrest. Alpha Publishing.

- International Association of Crime Analysts. (2009). Exploring crime analysis (2nd ed.). Book Surge Publishing.

- Madensen, T. D., & Eck, J. E. (2013). Crime places and place management. In F. T. Cullen & P. Wilcox (Eds.), The Oxford handbook of criminological theory. Oxford University Press.

- Miethe, T. D., & McCorkle, R. (2005). Crime profiles: The anatomy of dangerous persons, places, and situations (3rd ed.). Oxford University Press.

- National Crime Prevention Institute. (2001). Understanding crime prevention. Butterworth-Heinemann.

- Sennewald, C. A. (2015). Effective security management (6th ed.). Butterworth-Heinemann.

- Sennewald, C. A. (2012). Security consulting (4th ed.). Butterworth-Heinemann.

- U.S. Army Corps of Engineers. (1990). Security engineering manual: Missouri River Division/Omaha District. U.S. Army Corps of Engineers.

- U.S. Department of Justice. (1995). Vulnerability assessment of federal facilities. Government Printing Office.

- Vellani, K. H. (2020). Strategic security management: A risk assessment guide for decision makers (2nd ed.). CRC Press.

- Vellani, K. H. (2021). Unraveled: An evidence-based approach to understanding and preventing crime. Threat Analysis Group, LLC.



- Weisburd, D., Groff, E., & Yang, S.-M. (2012). The criminology of place: Street segments and our understanding of the crime problem. Oxford University Press.

- Weisburd, D., Braga, A. A., & Piquero, A. R. (2016). Place matters: Criminology for the twenty-first century. Cambridge University Press.





**FORENSIC SECURITY COMMITTEE MEMBERS**

**Committee Chair**
**Alan W. Zajic, CPP, CSP**
AWZ Consulting

**William J. Birks Jr., CPP, CSC**
William J. Birks Jr. & Associates

**James H. Clark, CPP**
Clark Security Group, LLC

**Michael S. D'Angelo, CPP, CSC, CHPA**
Secure Direction Consulting, LLC

**Steve Kaufer, CPP**
Inter/Action Associates

**Karim Vellani, CPP, CSC**
Threat Analysis Group, LLC

**Vince Vittatoe, CPP, CSC, CPTED**
Vittatoe Consulting, LLC

**Ken Wheatley, MA, CPP**
Royal Security Group, LLC

**Advisory Member**
**Chad Callaghan, CPP, CSC, CLSD**
Premises Liability Experts, LLC



**CASES CITING METHODOLOGY**

Case citations are added as cases come to the attention of the IAPSC Forensic Security Committee. Other cases may exist which address the Forensic Methodology.

- Hawkins v. Cypress Point Apartments, No. 1:19-CV-679-LG-RHW, 2021 WL 6803719 (S.D. Miss. Feb. 12, 2021).

- Doe v. AE Outfitters Retail Co., No. WDQ-14-508, 2015 WL 9255325 (D. Md. Dec. 17, 2015).

- Hopkins v. Nat'l R.R. Passenger Corp., No. 08CV2965NGGRML, 2015 WL 13741721 (E.D.N.Y. Aug. 20, 2015).

- Robles del Valle v. Vornado Realty Tr., No. CV 06-1818 (JAG), 2009 WL 10680876 (D.P.R. July 8, 2009).

- Childress v. Ky. Oaks Mall Co., No. 5:06CV-54-R, 2007 WL 2772299 (W.D. Ky. Sept. 20, 2007).

- Birge v. Dollar Gen. Corp., No. 04-2531 B, (W.D. Tenn. Dec. 29, 2006).



**FORENSIC METHODOLOGY**

## REVISION HISTORY

**June 2000**
Initial Release with approval from IAPSC membership in attendance at the annual meeting.

**May 2005**
Revised with approval by the IAPSC membership in attendance at the annual meeting.

**November 2008**
Revised with approval of the Board of Directors.

**November 2011**
Revised by IAPSC Forensic Security Committee – minor formatting changes and added references to bibliography.

**April 2014**
Revised with approval of IAPSC Forensic Security Committee – addition of language to Actual Crime section: "Relevant crimes in the immediate vicinity of the facility (three to five years prior to the date of the incident) as defined by and deemed relevant by the security expert."

**January 2018**
Revised with approval by the Board of Directors.

**December 2020**
Revised by IAPSC Forensic Security Committee – clarification of "security-related" cases covered by the Methodology and types of evidence available to the Forensic Consultant. Updated list of committee members.

**September 2023**
Revised by IAPSC Forensic Security Committee – added cases citing methodology and references, revised formatting. Updated list of committee members.

**January 2025**
Revised by IAPSC Forensic Security Committee with approval of the Board of Directors. Updated list of committee members.



**ABOUT THE IAPSC**

Founded in 1984, the International Association of Professional Security Consultants (IAPSC) is a widely recognized and respected association committed to establishing and maintaining the highest standards for security consultants in the industry.

IAPSC members are independent, non-product affiliated consultants who are required to meet strict educational, experience, and practice requirements, ensuring that they uphold the IAPSC code for professionalism and ethical conduct. For more information, to find an IAPSC security consultant, or to become a member of the association, visit www.iapsc.org.



